Terri R. Pickens (ISB #5828)
**Pickens Law, P.A.**
398 S. 9th Street, Suite 240
Boise, ID 83702
terri@pickenslawboise.com
Tel: (208) 954-5090
Fax: (208) 954-5099

Elisabeth Frost*
David R. Fox*
Justin Baxenberg*
Daniel Cohen*
Qizhou Ge*
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue NW, Suite 400
Washington, D.C. 20002
efrost@elias.law
dfox@elias.law
jbaxenberg@elias.law
dcohen@elias.law
age@elias.law
Tel: (202) 968-4490

*Attorneys for Plaintiffs*
*\*Motion for Admission Pro Hac Vice forthcoming*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **MARCH FOR OUR LIVES IDAHO** and **ROSAURA ALBIZO BARRON,**<br><br>            Plaintiffs,<br><br>v.<br><br>**PHIL MCGRANE**, in his official capacity as Idaho Secretary of State,<br><br>            Defendant. | Case No.: _____<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1

**INTRODUCTION**

Plaintiffs March For Our Lives Idaho ("MFOL Idaho") and Rosaura Albizo Barron, by and through their undersigned counsel, file this Complaint for Declaratory and Injunctive Relief against Defendant Phil McGrane, in his official capacity as Idaho Secretary of State, and allege as follows:

**NATURE OF THE CASE**

1.      For thirteen years, Idaho has required voters to show photo identification when they vote. From the outset, student identification has been an accepted form of voter identification. Accepting student identification has not caused a single documented problem, and hundreds of voters have used it in recent elections. Yet earlier today, Governor Little signed House Bill 124, which prohibits the use of student identification at polling places. This legislation is intended to make it harder for one group of people—young voters—to participate in Idaho's elections. It is therefore a violation of the U.S. Constitution's Twenty-Sixth Amendment and should be declared invalid and permanently enjoined.

2.      That House Bill 124 will make it harder for young voters to vote and was intended to have that effect is evident from the face of the law, the legislative record, and the context in which it was enacted. Young voters are overwhelmingly more likely to be students than older voters. And young voters are less likely to have other accepted forms of identification: an Idaho driver's license or identification card, a passport or federal identification card, a tribal identification card, or a concealed carry permit.

3.      Further, House Bill 124 comes in the context of an unprecedented wave of youth political activism in Idaho. The number of 18- and 19-year-olds registered to vote in Idaho increased 81% between 2018 and 2022, the largest such increase nationwide by far. Turnout by young voters in Idaho has also exploded in recent years, with 48% of eligible 18- to 29-year-old voters casting ballots in 2020—a 10-point increase from 2016, when only 38% of voters in that age range voted.

That young voters are increasingly making themselves heard in the political process in Idaho can be seen in other ways, too. For example, in September 2022, 18-year-old high school student Shiva Rajbhandari defeated a 47-year-old incumbent to join the Boise School Board. And young Idahoans have begun to testify at legislative hearings and otherwise participate in Idaho's political process in growing numbers.

4.      This increasing youth participation has come as the legislature has repeatedly taken up (and sometimes passed) controversial legislation on issues of particular importance to young voters, including prohibiting abortion, criminalizing some forms of medical care for transgender youth, prohibiting transgender girls and women from participating in girls' and women's sports, and allowing librarians and teachers to be prosecuted for providing students with books and other material deemed "harmful to minors." *See, e.g.*, 2022 Idaho S.B. 1309; 2022 Idaho H.B. 675; 2020 Idaho H.B. 500; 2020 Idaho H.B. 509; 2022 Idaho H.B. 666; 2023 Idaho H.B. 124. The legislature has also failed to do anything to address rising gun violence—a leading cause of death among young people in Idaho—and climate change, which poses a particular threat to young voters' futures.

5.      Rather than engaging with this growing youth activism, Idaho's existing political power has responded by trying to suppress it. This legislative session, both the House Judiciary, Rules and Administration Committee and the House Local Government Committee have prohibited or restricted testimony at their hearings from people younger than 18. The chair of the Local Government Committee—the sponsor of some of the controversial bills that attracted particularly strong youth opposition during the 2022 session—explained that large numbers of Idaho students have begun appearing to testify about the issues in front of her committee and that she does not think hearing from them is a good use of the committee's time.

6.      House Bill 124's prohibition on the use of student identification to vote is a major escalation of this effort to suppress growing political activism by young Idahoans. It is a surgical

attack on Idaho's young voters in response to their successful organizing efforts and increasing political power. By attacking the use of student identification, House Bill 124 singles out high school and college students and threatens their political participation while limiting their access to the franchise.

7.  This violates the Twenty-Sixth Amendment to the U.S. Constitution, which provides that voting rights "shall not be denied or abridged . . . by any State on account of age." That broad language does more than simply lower the voting age to 18; it expressly prohibits election rules that discriminate against young voters on account of age. The Amendment was enacted at a time of increasing alienation of young Americans, whose exclusion from the political process was causing political unrest. As a result, the Amendment's "goal was not merely to empower voting by our youths but was affirmatively to encourage their voting, through the elimination of unnecessary burdens and barriers, so that their vigor and idealism could be brought within rather than remain outside lawfully constituted institutions." *Worden v. Mercer Cnty. Bd. Of Elections*, 61 N.J. 325, 345, 294 A.2d 233, 243 (1972).

8.  Plaintiffs therefore bring this action under 42 U.S.C. § 1983 for a declaratory judgment that House Bill 124 violates the Twenty-Sixth Amendment and an injunction requiring Defendant to direct election workers to accept student identification cards as a valid form of voter identification.

## JURISDICTION AND VENUE

9.  Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the U.S. Constitution, specifically by the Twenty-Sixth Amendment.

10.  This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1343 because the matter in controversy arises under the Constitution and laws

of the United States and asserts the deprivation, under color of state law, of rights under the U.S. Constitution.

11.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendant is a resident of this district and a substantial part of the events that gave rise to Plaintiffs' claims for relief occurred in this district.

12.     This Court has the authority to enter declaratory and injunctive relief under Federal Rules of Civil Procedure 57 and 65 and 28 U.S.C. §§ 2201 and 2202.

## PARTIES

13.     Plaintiff March For Our Lives Idaho is a student-led organization that harnesses the power of young people to fight for common sense solutions to end gun violence in Idaho. MFOL Idaho is led by a board of six young activists, and its constituents include hundreds of supporters and volunteers registered with the organization who have pledged to take action to end gun violence and who benefit from, share in, and help guide the organization's priorities and activities. Through its advocacy campaigns, MFOL Idaho provides an outlet for collective action for the organization's base of young activists who are deeply concerned by and impacted by rising gun violence. MFOL Idaho organizes events, rallies, protests, and trainings, and its board members and volunteers testify in front of the state legislature to advocate for laws and policies to end gun violence. Because its advocacy in front of the legislature is frequently ignored, MFOL Idaho also conducts voter registration and voter turnout activities, targeting its efforts on young voters. Many of the young people whom MFOL Idaho engages are concerned about gun violence and see voting as an opportunity to make their voices and concerns heard.

14.     House Bill 124 harms the voters whom MFOL Idaho registers, MFOL Idaho's organizers and volunteers who register and turn out voters, and the organization's goals. Many of the voters that MFOL Idaho registers and turns out to vote are students, and some only possess a student

identification card. House Bill 124 makes it harder for those voters to vote and harder for MFOL Idaho to successfully register and turn them out to vote. Many are first-time voters and are unfamiliar with the process, and educating them on the requirements and obtaining acceptable identification in time for the election may be onerous. This confusion, and any disenfranchisement that results, will detract from MFOL Idaho's organizational mission of registering, engaging, and turning out young voters, building the youth political voice, and advocating for common sense measures to address gun violence, and it will require MFOL Idaho to divert resources towards voter education from other programming to ameliorate the law's disenfranchising and vote suppressing impacts.

15.     Plaintiff Rosaura Albizo Barron is a senior at Boise High School. She will turn 18 and become eligible to vote in August, and she plans to vote as soon as she is eligible. She plans to go to college next year, so she will remain a student. She does not have an Idaho driver's license or an identification card issued by the Idaho Transportation Department, nor does she have access to a car. She lacks the resources to learn how to drive, own a car, or go to the DMV to get an identification card. Her primary mode of transportation is walking, and she walks to school daily and to her part-time job at the downtown YMCA. When she needs to travel longer distances, she relies on her student identification to take the bus. Although she recently obtained a passport, her mother keeps her passport for safekeeping, and she does not know where it is or how to access it. House Bill 124 makes it harder for her to vote.

16.     Defendant Phil McGrane is the Secretary of State of Idaho and is named as a Defendant in his official capacity. Secretary McGrane is the Chief Election Officer for the State of Idaho, with the "responsibility to obtain and maintain uniformity in the application, operation and interpretation of the election laws." Idaho Code § 34-201. He also has the duty to "cause to be prepared and distributed to each county clerk detailed and comprehensive written directives and instructions relating to and based upon the election laws as they apply to elections, registration of

electors and voting procedures," with which county clerks "shall comply." *Id.* § 34-202. County clerks supervise elections "[s]ubject to and in accordance with the[se] directives and instructions." *Id.* § 34-206.

## STATEMENT OF FACTS AND LAW

### A. Idaho Voter Identification Law

17.     Until 2010, Idaho had no voter identification requirement. That year, Idaho enacted Idaho Code § 34-1113, which provides that "[a]ll voters shall be required to provide personal identification before voting." Idaho Code § 34-1113. When the requirement was first adopted, there were four accepted forms of identification:

> (1) An Idaho driver's license or identification card issued by the Idaho transportation department;
>
> (2) A passport or an identification card, including a photograph, issued by an agency of the United States government;
>
> (3) A tribal identification card, including a photograph; [or]
>
> (4) A current student identification card, including a photograph, issued by a high school or an accredited institution of higher education, including a university, college or technical school, located within the state of Idaho.

2010 Idaho Laws, ch. 246 (H.B. 496), § 2 (codified as amended at Idaho Code § 34-1113).

18.     Voters who are "not able to present" a form of acceptable identification may vote if they complete an affidavit stating their name and address, which must be signed under penalty of perjury. Idaho Code § 34-1114. The affidavit warns that knowingly providing false, erroneous, or inaccurate information is a felony. *Id.* Filling out an affidavit takes longer than showing identification and can lead to delays at polling places, and the warning language is often scary for voters. On information and belief, election workers do not always inform voters of the affidavit option or encourage voters to use it, and some voters who lack acceptable identification leave without voting rather than complete an affidavit.

19.     Before House Bill 124, the voter identification requirements had only been amended once since they were adopted thirteen years ago. In 2017, the legislature amended the identification requirement to add concealed-carry licenses as an additional accepted form of voter identification. *See* 2017 Idaho Laws, ch. 132, § 1 (codified at Idaho Code § 34-1113). Concealed carry licenses generally are not available to those younger than 21. *See* Idaho Code § 18-3302(11).

20.     House Bill 124 amends Idaho Code § 34-1113 to eliminate student identification as an acceptable means of voter identification, while otherwise leaving the rest of the voter identification requirements unchanged.

21.     House Bill 124's sponsor, Representative Tina Lambert, says that the bill is motivated by a desire to prevent vote fraud and deter "bad actors," specifically by students. To wit, she claimed that the bill was meant to eliminate the possibility that "students, maybe from a state like Washington or Oregon where they vote by mail, may come over here with their student ID and vote in person and then fill out their ballot in another state, thereby voting twice." Representative Lambert offered no evidence that this has ever occurred.

22.     In fact, there have been no documented problems with voter fraud involving student identification during the thirteen years in which such identification has been accepted in Idaho. According to the Heritage Foundation's database of election fraud cases, there have only been ten cases of voter or election fraud in Idaho since 2004, a number that encompasses ineligible and duplicate voting, false registrations, and ballot petition fraud. In none of these cases was student identification—or any form of identification—used to commit voter fraud. During this time, more than seven million votes were cast in primary and general elections in Idaho.

23.     Furthermore, voter fraud—including the scenario of double voting that Representative Lambert conjured in order to justify excising student identification from the voter

identification law—has long been a felony in Idaho, punishable by a fine of up to $1,000, up to 5 years in prison, or both. *See* Idaho Code §§ 18-2306, 18-2315.

24.     There is no indication that Idaho's safeguards to prevent voter fraud are in any way insufficient. In fact, Idaho election officials have repeatedly said that there are no widespread issues of voter fraud in Idaho elections. Following a manual recount after the November 2020 election, the Idaho Secretary of State found that the election "was executed with both integrity and accuracy," with only a 0.1% margin of error, and specifically rejected widespread accusations of election fraud.

25.     Indeed, even when testifying in support of House Bill 124, Idaho Secretary of State McGrane again reaffirmed that "we don't have rampant voter fraud" because the state has "sideboards and safeguards in place to prevent and protect against voter fraud." And when asked, he confirmed that he was not aware of any instances of voter fraud through the use of student identification.

26.     Nor does House Bill 124 eliminate Representative Lambert's imagined scenario of a person who uses a form of acceptable identification to vote in multiple states. The same imaginary risk is true of concealed carry permits and federal identification, both of which remain available as voter identification in Idaho. The difference, however, is that concealed carry licenses generally are not available to voters between 18 and 21, *see* Idaho Code § 18-3302(11), and U.S. Passports can cost $130 or more, making them prohibitively expensive for many Americans, including young people.

27.     Representative Lambert made clear in advocating for House Bill 124 that she knew that many young people do not drive or have a driver's license or any other accepted form of identification other than student identification. And she further recognized that obtaining such identification costs money. She downplayed this expense, however, quipping that such voters can

"simply go down to the DMV and get an ID card. It costs $10-15, which is the cost of 2-3 Starbucks drinks."

28.     Senator Herndon, House Bill 124's Senate sponsor, argued that student identification often does not list a residential address. But passports also do not list an address, yet they remain an accepted form of identification for voting.

29.     Senator Herndon also referred to the removal of student identification as addressing "low-hanging fruit" in protecting election integrity. He claimed that student IDs are not uniform and do not always require the same documentation and proof of residency requirements as state-issued IDs.

30.     But Secretary McGrane testified that the Boise and West Ada School Districts, the state's largest school districts, have student identification card processing requirements that are similar to those for state identification cards. Plaintiff Alibizo Barron has a student identification card from the Boise School District. Secretary McGrane also testified that there were concerns about student identification security at only "*some* of our universities" (emphasis added), and that his office has already been working with universities to address any concerns about the security of student identification. The solution, Secretary McGrane explained, could just be to "bolster the process for student IDs."

31.     If in fact the legislature was merely concerned with the security of student identification, it could have addressed this in myriad other ways short of prohibiting student identification, including through improvements to student identification that were already in process, as reflected by Secretary McGrane's testimony.

**B.  Rising Political Engagement by Young Idahoans**

32.     In recent years, Idaho has seen a surge in political participation and activism by young Idahoans. Driven by concern over pressing issues like gun violence and abortion rights, and thanks

in part to the organizing work of organizations such as MFOL Idaho, young voters are registering and voting in Idaho in increasingly large numbers. Voter registration rates for new voters aged 18-24 increased 16% in November 2022 compared to November 2018, and voter registration rates for new voters aged 18-19 increased 81% in November 2022 compared to November 2018, the highest increase in the country for that age group.

33.     Young voters also have turned out at higher levels in recent elections, both in Idaho and nationally. In the 2020 general election, 50% of voters aged 18 to 29 voted, an 11-point increase from the 2016 rate of 39% and one of the highest rates of young voter turnout since the voting age was lowered to 18, while Idaho young voters turned out at 48% in 2020, a 10-point increase from the 2016 rate of 38%. Nationally, voters aged 18 to 29 turned out to vote at 27% in 2022 and 31% in 2018, historic rates after hovering around 20% turnout in previous midterm elections since the 1990s.

34.     Young Idahoans' increasing political participation has also taken other forms. Last fall, current high school student and 18-year-old Shiva Rajbhandari was elected to the Boise School District's Board of Trustees, defeating a 47-year-old incumbent. Mr. Rajbhandari explained that he was motivated by his "sense of the value of student empowerment, that students really do deserve a voice at the table," and that "we really do have a lot to bring to the table when we're given a seat."

35.     In recent years, Idaho students have repeatedly organized to protest at the Idaho Capitol to protect transgender rights and against legislative bills limiting those rights. At these rallies, students also encouraged each other to vote and to stay politically engaged.

36.     Some students who would be personally affected by proposed bills' restrictions on certain medical care for transgender youth have shared deeply personal testimony about their experiences in front of Idaho legislators in the hopes of preventing those bills from becoming law.

37.     Students have shown up in increasingly large numbers because they feel that their "rights are on the line," and testifying is "such a critical avenue to have [youth] voices represented

11

in government, especially a government that is passing legislation that critically affects [their] daily lives and . . . rights."

38.     This increased political activism by young Idahoans is a direct response to the legislature's growing attacks on the political interests of young people. The legislature has repeatedly taken up and sometimes passed controversial legislation on issues of particular importance to Idaho's young voters, including legislation related to reproductive health care, health care for transgender youth, participation of transgender youth in sports, blocking transgender people from changing the gender listed on their birth certificates, allowing for the prosecution of librarians and teachers for providing students with books and other material deemed "harmful to minors," and now banning the use of student identification to vote. *See* 2022 Idaho S.B. 1309; 2022 Idaho H.B. 675; 2020 Idaho H.B. 500; 2020 Idaho H.B. 509; 2022 Idaho H.B. 666; 2023 Idaho H.B. 124. The legislature has also rolled back protections against rising gun violence—a leading cause of death among young people in Idaho—and refused to do anything to address climate change, which particularly threatens young voters' futures. Youth activists have mobilized around these issues, demanding action from legislators.

## C. The Legislature's Recent Attempts to Suppress Youth Political Engagement

39.     The legislature has responded to this growing youth activism by seeking to stifle it. This legislative session, two house committees have, for the first time, sharply restricted testimony by Idahoans who are not yet 18 years old.

40.     Chairman Skaug of the House Judiciary, Rules and Administration Committee has explained that there will be "[n]o testimony from those under 18 unless I invite them" this session, and that he is unhappy there were "16 year olds taking the place of 40 year olds . . . . I just want some control. To be able to get the testimony of all the adults, taxpayers in the room." In the 2022 session, Chairman Skaug sponsored House Bill 675, which would have criminalized some forms of medical

care for transgender youth, even with parental consent, and which attracted extensive hostile public testimony from young Idahoans.

41.     Chairwoman Ehardt of the House Local Government Committee similarly announced this session that her committee would not hear testimony from those under 18 unless she gave permission in advance, explaining that she did not think hearing from large numbers of young Idahoans was a good use of the legislature's time. In the 2022 session, Chairwoman Ehardt sponsored House Bill 500, which prohibits transgender women and girls from participating in women's and girls' sports, and which similarly attracted hostile public testimony from young Idahoans.

42.     In response to public outcry over these actions, Chairman Skaug later softened his policy slightly to allow testimony from young Idahoans if their parents first fill out a permission slip or accompany them for their testimony. But as young Idahoans have themselves explained, this hardly resolves the issue, because parents may often not be supportive of their children's political views or testimony on issues of particular concern to young people. Furthermore, the committee's official policy is that adult testimony may be given preference over youth testimony.

**D. House Bill 124's Escalation of the Legislature's Targeted Suppression Efforts**

43.     House Bill 124 is a radical escalation of the legislature's response to growing youth activism in Idaho. By surgically excising student identification—and only student identification—from the list of accepted voter identification, House Bill 124 eliminates a form of identification that is available almost exclusively to young Idaho voters and that such voters are particularly likely to have.

44.     Nationwide, 85% of full-time college students are younger than 25, and 95% of full-time college students are younger than 35. Part-time students are somewhat older, but even so, nearly 60% of part-time college students are younger than 25 and 82% are younger than 35. High school students, of course, are younger still.

45.     Young voters are also less likely to have other accepted forms of voter identification. According to the Federal Highway Administration, nationwide, only 59.7% of 18-year-olds, 68.3% of 19-year-olds, and 74.4% of 20-year-olds had a driver's license in 2021. In contrast, more than 90% of 30- to 79-year-olds had a driver's license. Only about a third of Americans of any age have a U.S. Passport. And concealed-carry permits are generally available only to those 21 and older. *See* Idaho Code § 18-3302(11).

46.     Idaho also makes it difficult for people who move to Idaho from out-of-state, including out-of-state college students, to obtain an Idaho driver's license. Even drivers who already have a valid driver's license in another state must pass a visual screening test and a written knowledge test of Idaho's traffic rules to obtain an Idaho driver's license.

47.     House Bill 124 serves no legitimate purpose and is a direct and intentional attack on Idaho's young voters in response to their successful organizing efforts and increased political power.

## CLAIM FOR RELIEF

### Twenty-Sixth Amendment
### U.S. Const. amend XXVI, 42 U.S.C. § 1983, 28 U.S.C. § 2201, 28 U.S.C. § 2202
### Denial or Abridgement of the Right to Vote on Account of Age

48.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 47 as though fully set forth herein.

49.     The Twenty-Sixth Amendment to the U.S. Constitution provides in relevant part: "The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by . . . any State on account of age."

50.     "Abridge" means to "curtail, lessen, or diminish; to reduce the extent or scope of." Oxford English Dictionary (3d ed. 2009).

51.     The Twenty-Sixth Amendment's language, providing that rights of citizens eighteen and older to vote "shall not be denied or abridged . . . by any State on account of age," mirrors the

Fifteenth Amendment's prohibition on race discrimination in voting, which provides that voting rights "shall not be denied or abridged . . . on account of race, color, or previous condition of servitude." U.S. Const., amend. XV, § 1. When the Twenty-Sixth Amendment was ratified in 1971, that language had been understood for decades to prohibit not only facially race-based restrictions but also facially race-neutral restrictions that were "motivated by a discriminatory purpose." *City of Mobile v. Bolden*, 446 U.S. 55, 62 (1980) (citing *Guinn v. United States*, 238 U.S. 347 (1915)), *superseded by statute on other grounds*, 96 Stat. 134.

52.     The Twenty-Sixth Amendment was ratified in 1971, in the context of extraordinary social upheaval driven by politically active young people. The government and older Americans first responded to that activism by trying to suppress it. The results included the 1968 student shutdown of Columbia University, the violence at the 1968 Democratic National Convention in Chicago, and the Kent State massacre. The Twenty-Sixth Amendment tried a more constructive approach. The Congress that proposed the Amendment "uniformly expressed distress at the alienation felt by some youths, and expressed hope that youth's idealism could be channelled within the political system." *Jolicoeur v. Mihaly*, 5 Cal. 3d 565, 572, 488 P.2d 1, 5 (1971). Congress believed that "some of the student unrest of recent years has led to deplorable violence and intolerance," but also that "much of this unrest reflects the interest and concern of today's youth over the important issues of our day." *Id.* at 573 (quoting S. Rep. No. 92-26, at 365–67 (1971)). And Congress concluded that "we must channel these energies into our political system and give young people the real opportunity to influence our society in a peaceful and constructive manner," lest they be driven "into a search for an alternative, sometimes violent, means to express their frustrations over the gap between the nation's ideals and actions." *Id.* at 574 (quoting S. Rep. No. 92-26, at 365–67).

53.     In debating a statutory provision similar to the Twenty-Sixth Amendment a few years before the Amendment was adopted, Congress recognized that youth political energy "is going to

continue to build and grow. The only question is whether we should ignore it, perhaps leaving this energy to dam up and burst and follow less-than-wholesome channels, or whether we should let this force be utilized by society through the pressure valve of the franchise." *Lowering the Voting Age to 18: Hearing on S.J. Res. 8, S.J. Res. 14, and S.J. Res 78 Before the Subcomm. On Const. Amends. Of the S. Comm. on the Judiciary*, 90th Cong. 3, 74 (1968) (statement of Sen. Birch Bayh). Through the Twenty-Sixth Amendment, Congress elected to channel youth political energy through the vote.

54.    As a result, the Twenty-Sixth Amendment sought "not merely to empower voting by our youths but was affirmatively to encourage their voting, through the elimination of unnecessary burdens and barriers, so that their vigor and idealism could be brought within rather than remain outside lawfully constituted institutions." *Worden*, 294 A.2d at 243. Congress believed that "forcing young voters to undertake special burdens . . . in order to exercise their right to vote might well serve to dissuade them from participating in the election," and thus undermine the Amendment's purpose. S. Rep. No. 92-26, at 14 (1971).

55.    Congress and the courts have recognized that the Amendment has "particular relevance for the college youth who comprise approximately 50 per cent of all who were enfranchised by this amendment." *Walgren v. Howes*, 482 F.2d 95, 101 (1st Cir. 1973) (citing 117 Cong. Rec. 5817, 5825 (1971) (statements of Sens. Charles Percy and Edward Brooke)).

56.    The Twenty-Sixth Amendment therefore not only lowers the voting age to eighteen, but also prohibits age discrimination in voting, including facially age-neutral restrictions that are motivated by an age-discriminatory purpose. *League of Women Voters v. Detzner*, 314 F. Supp. 3d 1205, 1222–23 (N.D. Fla. 2018) (holding plaintiffs were substantially likely to succeed on merits of Twenty-Sixth Amendment claim in challenge to restrictive state guidance that prohibited early voting sites on college campuses, finding the prohibition "unexplainable on grounds other than age because it bears so heavily on younger voters"); *Colo. Project-Common Cause v. Anderson*, 495 P.2d 220,

223 (Colo. 1972) (holding based on "[h]istory and reason" that the Twenty-Sixth Amendment's "prohibition against denying the right to vote to anyone eighteen years or older by reason of age applies to the entire process involving the exercise of the ballot and its concomitants").

57.     Representative Gannon, who opposed House Bill 124, alluded to the purpose and protections of the Twenty-Sixth Amendment in House and Committee debates, repeating the sentiment "old enough to serve in our military, old enough to vote" and noting that when society does not encourage young people to get involved in the system, "that's when we have picketing, protests, disruption of government."

58.     House Bill 124 violates the Twenty-Sixth Amendment because it was motivated by a discriminatory purpose. It was adopted in response to an unprecedented wave of political activism by young Idahoans, alongside other measures like restrictions on legislative testimony by young people that represent a clear backlash to that activism. It surgically targets young Idahoans and makes it harder for them to vote, because they are far more likely to have student identification, and to lack other accepted forms of voter identification, than older voters. Finally, it is inexplicable on other grounds, because the acceptance of student identification has not caused a single documented problem in the thirteen years since Idaho began requiring voter identification. Simply put, there was no real problem to be solved, and the "solution" to the made-up problem was both under- and over-inclusive of the concerns raised, including concerns about double voting and security of student identification.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

a)   declaring, under the authority granted to this Court by 28 U.S.C. § 2201, that House Bill 124 violates the Twenty-Sixth Amendment to the U.S. Constitution;

b) enjoining the Secretary, under the authority granted to this Court by 28 U.S.C. § 2202, from

enforcing House Bill 124;

c) awarding Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in

bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

d) granting such other and further relief as the Court deems just and proper.

Dated: March 17, 2023                           Respectfully submitted,

/s/ Terri R. Pickens

Terri R. Pickens (ISB #5828)
**PICKENS LAW, P.A.**
398 S. 9th Street, Suite 240
Boise, ID 83702
terri@pickenslawboise.com
Tel: (208) 954-5090
Fax: (208) 954-5099

Elisabeth Frost*
David R. Fox*
Justin Baxenberg*
Daniel Cohen*
Qizhou Ge*
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue NW, Suite 400
Washington, D.C. 20002
efrost@elias.law
dfox@elias.law
jbaxenberg@elias.law
dcohen@elias.law
age@elias.law
Tel: (202) 968-4490

*Attorneys for Plaintiffs*
*\*Motion for Pro Hac Vice forthcoming*