Terri R. Pickens (ISB #5828)
**Pickens Law, P.A.**
398 S. 9th Street, Suite 240
Boise, ID 83702
terri@pickenslawboise.com
Tel: (208) 954-5090
Fax: (208) 954-5099

Elisabeth Frost*
David R. Fox*
Justin Baxenberg*
Daniel Cohen*
Qizhou Ge*
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue NW, Suite 400
Washington, D.C. 20002
efrost@elias.law
dfox@elias.law
jbaxenberg@elias.law
dcohen@elias.law
age@elias.law
Tel: (202) 968-4490

*Attorneys for Plaintiffs*
*\*Admitted pro hac vice*

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| **MARCH FOR OUR LIVES IDAHO** and **IDAHO ALLIANCE FOR RETIRED AMERICANS**, <br><br>      Plaintiffs, <br><br> v. <br><br> **PHIL MCGRANE**, in his official capacity as Idaho Secretary of State, <br><br>      Defendant. | Case No.: 1:23-cv-00107-CWD <br><br><br> **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1

**INTRODUCTION**

Plaintiffs March For Our Lives Idaho ("MFOL Idaho") and Idaho Alliance for Retired Americans ("Alliance"), by and through their undersigned counsel, file this Complaint for Declaratory and Injunctive Relief against Defendant Phil McGrane, in his official capacity as Idaho Secretary of State, and allege as follows:

**NATURE OF THE CASE**

1.      For thirteen years, Idaho has required voters to show photo identification when they vote. From the outset, student identification has been an accepted form of voter identification. Accepting student identification has not caused a single documented problem, and hundreds of voters have used it in recent elections. Yet on March 15, 2023, Governor Little signed House Bill 124, which prohibits the use of student identification as a form of voter identification at polling places. And on April 4, 2023, the Governor signed House Bill 340, which requires specific forms of photo identification—again excluding student identification—to *register* to vote, eliminating longstanding alternative ways of proving residence. Taken together, House Bill 124 and House Bill 340 violate federal law in at least three ways. They should be declared invalid and permanently enjoined.

2.      First, House Bill 124 and House Bill 340 violate the Twenty-Sixth Amendment to the U.S. Constitution. The text of the laws, the legislative record, and the context in which the legislature enacted them all show that the laws were intended to, and will, make it harder for young voters to participate in Idaho's elections. Compared with older voters, young voters are overwhelmingly more likely to be students and less likely to have other accepted forms of identification: an Idaho driver's license or identification card, a passport or federal identification card, a tribal identification card, or a concealed carry permit. House Bill 124 and House Bill 340 come in the context of an unprecedented wave of youth political activism in Idaho, where the number of 18- and 19-year-olds registered to vote increased 81% between 2018 and 2022, the largest such increase nationwide by far. This

increasing youth participation has come as the legislature has repeatedly taken up (and sometimes passed) controversial legislation on issues of particular importance to young voters. Idaho's existing political power has responded to the activism by trying to suppress it. In the most recent legislative session, both the House Judiciary, Rules and Administration Committee and the House Local Government Committee prohibited or restricted testimony at their hearings from people younger than 18. The chair of the Local Government Committee—the sponsor of some of the controversial bills that attracted particularly strong youth opposition during the 2022 session—explained that large numbers of Idaho students have begun appearing to testify about the issues in front of her committee and that she does not think hearing from them is a good use of the committee's time.

3.      House Bill 124 and House Bill 340 are a major escalation of an ongoing effort by the Idaho legislature to suppress growing political activism by young Idahoans. They single out high school and college students in response to their successful organizing efforts and increasing political power.

4.      Second, House Bill 340 imposes an unconstitutional poll tax in violation of the Twenty-Fourth Amendment and the Fourteenth Amendment's Equal Protection Clause. House Bill 340 requires new registrants to show one of four forms of photo identification to register, each of which generally may be obtained only after payment of a government fee. And while House Bill 340 provides for free voter identification cards for some Idahoans, it makes those cards available only to those who are (a) already 18 years old or older, and (b) have not had a valid driver's license in the preceding six months. It therefore excludes many eligible voters, including those who will turn 18 shortly before an election and those—such as some elderly voters—who previously had a driver's license but would not otherwise renew it. Those voters will need to pay a government fee to obtain an identification card if they wish to vote—a textbook unconstitutional poll tax. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198 (2008).

5.      Third, House Bill 340 unconstitutionally discriminates against new voters as compared with existing registrants in violation of the Equal Protection Clause. Even with the passage of House Bill 124 and House Bill 340, existing registrants can vote in Idaho without showing any photo identification by completing an affidavit that verifies, under penalty of perjury, their name and residential address. But new voters without an approved form of photo identification cannot register and therefore cannot vote. This disparity is intentional: after passing House Bill 124 and before passing House Bill 340, the legislature rejected House Bill 137, which would have eliminated the affidavit option, after a debate in which legislators emphasized that they did not want to make voting harder for *existing* Idaho voters, only for newly registered ones. By imposing a substantial barrier to voting on only a disfavored subset of eligible voters, House Bill 340 violates the Equal Protection Clause.

6.      Plaintiffs bring this action under 42 U.S.C. § 1983 for a declaratory judgment that House Bill 124 and House Bill 340 violate the Twenty-Sixth Amendment, the Twenty-Fourth Amendment, and the Equal Protection Clause of the Fourteenth Amendment, and an injunction requiring Defendant to direct election workers to continue accepting student identification cards as a valid form of voter identification and to not enforce House Bill 340's new identification requirements for voter registration.

## JURISDICTION AND VENUE

7.      Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the U.S. Constitution, specifically by the Twenty-Sixth Amendment, the Twenty-Fourth Amendment, and the Equal Protection Clause of the Fourteenth Amendment.

8.      This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1343 because the matter in controversy arises under the Constitution and laws

of the United States and asserts the deprivation, under color of state law, of rights under the U.S. Constitution.

9.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendant is a resident of this district and a substantial part of the events that gave rise to Plaintiffs' claims for relief occurred in this district.

10.     This Court has the authority to enter declaratory and injunctive relief under Federal Rules of Civil Procedure 57 and 65 and 28 U.S.C. §§ 2201 and 2202.

## PARTIES

11.     Plaintiff March For Our Lives Idaho is a student-led organization that harnesses the power of young people to fight for common sense solutions to end gun violence in Idaho. MFOL Idaho is led by a board of six young activists, and its constituents include hundreds of supporters and volunteers registered with the organization who have pledged to take action to end gun violence and who benefit from, share in, and help guide the organization's priorities and activities. Through its advocacy campaigns, MFOL Idaho provides an outlet for collective action for the organization's base of young activists who are deeply concerned by and impacted by rising gun violence. MFOL Idaho organizes events, rallies, protests, and trainings, and its board members and volunteers testify in front of the state legislature to advocate for laws and policies to end gun violence. Because its advocacy in front of the legislature is frequently ignored, MFOL Idaho also conducts voter registration and voter turnout activities, targeting its efforts on young voters. Many of the young people whom MFOL Idaho engages are concerned about gun violence and see voting as an opportunity to make their voices and concerns heard.

12.     House Bill 124 and House Bill 340 harm MFOL Idaho's constituents, including the voters MFOL Idaho registers and MFOL Idaho's organizers and volunteers who register and turn out voters. Many of the voters that MFOL Idaho registers and turns out to vote are students, and some

only possess a student identification card. House Bill 124 and House Bill 340 make it harder for those voters to register and vote and harder for MFOL Idaho to successfully register and turn them out to vote. Many are first-time voters and are unfamiliar with the process, and educating them on the requirements and obtaining acceptable identification in time for the election is often onerous. In addition to harming MFOL Idaho's constituents, this confusion, and any disenfranchisement that results, will detract from MFOL Idaho's organizational mission of registering, engaging, and turning out young voters, building the youth political voice, and advocating for common sense measures to address gun violence, and it will require MFOL Idaho to divert resources towards voter education from other programming to ameliorate the law's disenfranchising and vote suppressing impacts.

13.     Plaintiff Idaho Alliance for Retired Americans (the "Alliance") is a 501(c)(4) nonprofit, social welfare organization and a chartered state affiliate of the Alliance for Retired Americans. The Alliance's mission is to protect the civil rights of retirees and ensure that they obtain social and economic justice. The Alliance has 11,407 members, made up of retirees from public and private sector unions, community organizations, and individual activists. The Alliance's members benefit from, share in, and help guide the organization's priorities and activities. The Alliance asserts the claims on behalf of itself and its members.

14.     Many of the Alliance's members are elderly, and some no longer drive and do not need or wish to renew their driver's licenses. Some are new to Idaho, having retired here or recently moved here, and are not yet registered to vote here. Others anticipate needing to re-register because they are moving to a new address or have not voted in the last four years. House Bill 340 makes it harder for them to register to vote and will force some of them to pay a government fee for an identification card in order to register to vote.

15.     House Bill 340 also frustrates the Alliance's mission by impeding its members' ability to vote, threatening the electoral prospects of the candidates the Alliance endorses, and making it

more difficult for the Alliance and its members to associate to effectively further their shared political goals. The Alliance and its individual members spend resources on voter registration, get-out-the-vote activities, and other voter engagement and education activities directed at its members and other elderly Idahoans. The Alliance and its individual members also spend resources on recruiting new members, opening new chapters, making presentations to members, and promoting substantive policy campaigns in areas such as retirement income security, pension protections, social security, Medicare, Medicaid, and services for older Idahoans. House Bill 340 will force the Alliance to divert resources away from these activities and towards educating its members about the stricter voter registration requirements and helping them obtain acceptable photo identification.

16.     Defendant Phil McGrane is the Secretary of State of Idaho and is named as a Defendant in his official capacity. Secretary McGrane is the Chief Election Officer for the State of Idaho, with the "responsibility to obtain and maintain uniformity in the application, operation and interpretation of the election laws." Idaho Code § 34-201. He also has the duty to "cause to be prepared and distributed to each county clerk detailed and comprehensive written directives and instructions relating to and based upon the election laws as they apply to elections, registration of electors and voting procedures," with which county clerks "shall comply." *Id.* § 34-202. County clerks supervise elections "[s]ubject to and in accordance with the[se] directives and instructions." *Id.* § 34-206.

## STATEMENT OF FACTS AND LAW

### A.  Idaho Voter Registration Law

17.     For decades, Idaho has required eligible voters to register before they may vote, either at their polling place on election day or in advance.

18.     Before House Bill 340, voters who registered on election day, or at an absent electors' polling place, could do so by showing any one of three things: (1) an Idaho driver's license or

identification card; (2) "any document which contains a valid address in the precinct together with a picture identification card"; or (3) "a current valid student photo identification card" from an Idaho university "accompanied with a current student fee statement that contains the student's valid address in the precinct." Idaho Code § 34-408A.[1] Thus, voters who did not have an Idaho driver's license or identification card could still register to vote on election day by showing *any* photo identification card along with any document showing an address in the precinct, and students could register with their student identification and a fee statement.

19.     Idaho law before House Bill 340 also allowed voters to register before election day, either electronically, in person before an official registrar or at the office of the county clerk, or by mail. Idaho Code §§ 34-407, -409, -410. Voters could register electronically only if they had an Idaho driver's license or identification card. Idaho Code § 34-409. But voters could register in person before an official registrar or at the county clerk's office without showing any form of identification. Idaho Code § 34-407. And voters who registered by mail were required only to show *either* "current and valid photo identification" *or* "a current utility bill, bank statement, government check, paycheck, or other government document" showing their address. Idaho Code § 34-410.

20.     House Bill 340 fundamentally changes these requirements by mandating for the first time that everyone registering to vote—by mail or in-person, whether on election day or before—show one of four specified forms of photo identification:

> (a) A current driver's license or identification card issued pursuant to title 49, Idaho Code;
>
> (b) A current passport or other identification card issued by an agency of the United States government;

---

[1] As of the date of this Second Amended Complaint, West's Idaho Code Annotated version of this statute contains an error, describing the second option as requiring a "picture identification *application*." Examination of the most recent session law, 2016 Idaho Laws, Ch. 359, § 5, confirms that the enacted statute instead requires any "picture identification *card*."

(c) A current tribal identification card; or

(d) A current license or enhanced license to carry concealed weapons issued under section 18-3302, Idaho Code, or section 18-3302K, Idaho Code.

2023 Idaho H.B. 340, § 5 (to be codified at Idaho Code § 34-411).

21.    Under House Bill 340, (a), (c), and (d) are also sufficient to prove residence, while a voter who registers with a passport or other identification card issued by an agency of the U.S. government must also provide one of the following documents displaying their name and current Idaho physical address as proof of residence:

(ii) A current proof of insurance;

(iii) A deed of trust, mortgage, or lease or rental agreement;

(iv) A property tax assessment, bill, or receipt;

(v) A utility bill, excluding a cellular telephone bill;

(vi) A bank or credit card statement;

(vii) A paystub, paycheck, or government-issued check;

(viii) An intake document from a residential care or assisted living facility licensed pursuant to the provisions of chapter 33, title 39, Idaho Code;

(ix) Enrollment papers issued for the current school year by a high school or an accredited institution of higher education located within the state of Idaho; or

(x) A communication on letterhead from a public or private social service agency registered with the secretary of state verifying the applicant is homeless and attesting to the applicant's residence for registration purposes.

2023 Idaho H.B. 340, § 5 (to be codified at Idaho Code § 34-411).

22.    House Bill 340 will make it impossible, for the first time, for eligible voters to register to vote without an approved form of photo identification. Such voters cannot register electronically,

because they do not have an Idaho driver's license or identification card. And after House Bill 340 they cannot register in person or by mail, either.

23.     House Bill 340's list of accepted forms of identification intentionally excludes out-of-state driver's licenses and identification cards. House Bill 126, a bill from earlier in the session that sought to impose similar voter registration requirements, included out-of-state driver's licenses and identification cards to allow new residents with still-valid out-of-state identification to register to vote. House Bill 126 was amended and reintroduced as House Bill 340 to exclude such licenses after House State Affairs Committee Chair Crane objected to accepting such licenses because students who vote in Idaho "should have to have an Idaho license."

24.     Each of the forms of photo identification that House Bill 340 requires for voter registration is generally issued only after payment of a government fee. Idaho charges $10 to $25 for a non-driver identification card and $30 to $60 for a driver's license. It charges additional fees for the knowledge and skills tests required to obtain a driver's license. The U.S. government charges at least $130 for a passport and $100 for a Global Entry card. And Idaho charges $15 to $20 for a concealed weapons license. Most Idaho voters are not eligible for tribal identification cards, or other forms of federal identification.

25.     House Bill 340 attempts to address this problem by providing for no-fee identification cards, but it does not make those cards available to everyone who might need one to register to vote. Individuals may obtain a no-fee identification card only if they are already 18 or older and have not possessed a current driver's license in the preceding six months. 2023 Idaho H.B. 340, § 8. This leaves out at least three categories of eligible voters who will now be forced to pay for a state-issued identification card to register to vote: (1) voters who turn 18 shortly before the election and do not have time to obtain an identification card after they turn 18 but before election day, (2) voters who currently have a driver's license but who no longer drive and would like to stop renewing their

driver's license; and (3) voters who move to Idaho shortly before election day and have not yet converted their still-valid out-of-state license, which requires passing a written test. House Bill 340 will require all those eligible voters to pay for an identification card if they wish to register to vote.

26.     Moreover, because House Bill 340's identification requirement applies only to new voter registrants, and not to existing registrants, it discriminates against new registrants and in favor of existing ones. Existing registrants may continue to vote without showing any photo identification by signing an affidavit verifying their identity and residence. Idaho Code § 34-1113. But new registrants may not do so, because House Bill 340 provides no similar affidavit alternative to the identification requirements applicable to voter registration.

27.     This disparate treatment of new and existing registrants is intentional. This session, the House also considered House Bill 137, which sought to repeal Idaho Code § 34-1114 and eliminate the affidavit option for voters unable to present acceptable identification at the polls.

28.     House Bill 137 failed in the House on March 21, 2023, and, during debates, legislators sympathized with the "forgetful farmer" who may accidentally misplace their wallet or leave it at home and the "elderly grandparent" who may no longer drive or need a driver's license.

29.     Representative Raybould argued that "there are certain individuals within our state that lean towards the more elderly side who may or may not have a driver's license at this point in their life . . . are we saying that those individuals because they're no longer driving should no longer have the ability to vote? . . . When you reach a certain age, the need for [passports and other IDs] is less . . . The affidavit provides a way for those in our community who are no longer participating in the same capacity that they did previously to participate in the election."

30.     Representative Mickelsen argued that her husband is an "absent-minded farmer . . . [who] often loses his driver's license. And many times, as he's headed in to vote at five or ten minutes to eight because he's been out working, he's had to fill out those affidavits. I've also had elderly

grandparents that at times do not have any additional photo ID, and to take away the very right to vote for those people is wrong."

31.     In contrast to their solicitude for long-time residents without identification, legislators expressed far less concern for new registrants facing the same hurdles. Representative Clow argued that "there's a difference when you walk into the polls and you're already a voter and someone who's not a registered voter. . . . If he's a registered voter, everything's correct, but he left his driver's license at home. . . I think that person should be able to sign an affidavit and vote. But someone walking in for the first time to the polls and doesn't have proper ID, I think that's a problem."

32.     Representatives Raybould, Mickelsen, and Clow all voted in favor of House Bill 340's imposing absolute photo identification requirements on new registrants, despite voting against House Bill 137's elimination of the affidavit fallback for existing registrants.

33.     Ultimately, the Idaho legislature rejected House Bill 137 but passed House Bill 340, and thereby ensured that existing voters can continue to vote even if they lack accepted forms of identification but that new voters cannot.

34.     House Bill 340 was passed at lightning speed: it was pushed through at the end of the legislative session, with several procedural irregularities. It was introduced in the House and read for the first time on March 20, and it was passed by the House the very next day, after the House voted to suspend all rules interfering with its immediate consideration, including the requirement that all bills be read on three separate days. Debate on the bill was minimal, and the only question asked about House Bill 340 in Senate debates was resolved during an off-the-record at ease session, which was called in the middle of the question. House Bill 340 is scheduled to take effect on July 1, 2023.

**B.  Idaho Voter Identification Law**

35.     Until 2010, Idaho had no voter identification requirement. That year, Idaho enacted Idaho Code § 34-1113, which provides that "[a]ll voters shall be required to provide personal

identification before voting." Idaho Code § 34-1113. When the requirement was first adopted, there were four accepted forms of identification:

> (1) An Idaho driver's license or identification card issued by the Idaho transportation department;
>
> (2) A passport or an identification card, including a photograph, issued by an agency of the United States government;
>
> (3) A tribal identification card, including a photograph; [or]
>
> (4) A current student identification card, including a photograph, issued by a high school or an accredited institution of higher education, including a university, college or technical school, located within the state of Idaho.

2010 Idaho Laws, ch. 246 (H.B. 496), § 2 (codified as amended at Idaho Code § 34-1113).

36.     Voters who are "not able to present" a form of acceptable identification may vote if they complete an affidavit stating their name and address, which must be signed under penalty of perjury. Idaho Code § 34-1114. The affidavit warns that knowingly providing false, erroneous, or inaccurate information is a felony. Filling out an affidavit takes longer than showing identification and can lead to delays at polling places, and the warning language is often scary for voters. On information and belief, election workers do not always inform voters of the affidavit option or encourage voters to use it, and some voters who lack acceptable identification leave without voting rather than complete an affidavit.

37.     Before House Bill 124, the voter identification requirements had only been amended once since they were adopted thirteen years ago. In 2017, the legislature amended the identification requirement to add concealed-carry licenses as an additional accepted form of voter identification. *See* 2017 Idaho Laws, ch. 132, § 1 (codified at Idaho Code § 34-1113). Concealed carry licenses generally are not available to those younger than 21. *See* Idaho Code § 18-3302(11).

38.    House Bill 124 amends Idaho Code § 34-1113 to eliminate student identification as an acceptable means of voter identification, while otherwise leaving the rest of the voter identification requirements unchanged. It is scheduled to take effect on January 1, 2024.

39.    House Bill 124's sponsor, Representative Tina Lambert, said that the bill was motivated by a desire to prevent vote fraud and deter "bad actors," specifically by students. To wit, she claimed that the bill was meant to eliminate the possibility that "students, maybe from a state like Washington or Oregon where they vote by mail, may come over here with their student ID and vote in person and then fill out their ballot in another state, thereby voting twice." Representative Lambert offered no evidence that this has ever occurred.

40.    In fact, there have been no documented problems with voter fraud involving student identification during the thirteen years in which such identification has been accepted in Idaho. According to the Heritage Foundation's database of election fraud cases, there have only been ten cases of voter or election fraud in Idaho since 2004, a number that encompasses ineligible and duplicate voting, false registrations, and ballot petition fraud. In none of these cases was student identification—or any form of identification—used to commit voter fraud. During this time, more than seven million votes were cast in primary and general elections in Idaho.

41.    Furthermore, voter fraud—including the scenario of double voting that Representative Lambert conjured in order to justify excising student identification from the voter identification law—has long been a felony in Idaho, punishable by a fine of up to $1,000, up to 5 years in prison, or both. *See* Idaho Code §§ 18-2306, 18-2315.

42.    There is no indication that Idaho's safeguards to prevent voter fraud are in any way insufficient. In fact, election officials have repeatedly said that there are no widespread issues of voter fraud in Idaho elections. Following a manual recount after the November 2020 election, the

Secretary of State found that the election "was executed with both integrity and accuracy," with only a 0.1% margin of error, and specifically rejected widespread accusations of election fraud.

43.     Indeed, even when testifying in support of House Bill 124, Secretary of State McGrane again reaffirmed that "we don't have rampant voter fraud" because the state has "sideboards and safeguards in place to prevent and protect against voter fraud." And when asked, he confirmed that he was not aware of any instances of voter fraud through the use of student identification.

44.     Nor does House Bill 124 eliminate Representative Lambert's imagined scenario of a person who uses a form of acceptable identification to vote in multiple states. The same imaginary risk is true of concealed carry permits and federal identification, both of which remain available as voter identification. The difference, however, is that concealed carry licenses generally are not available to voters between 18 and 21, *see* Idaho Code § 18-3302(11), and U.S. passports can cost $130 or more, making them prohibitively expensive for many Americans, including young people.

45.     Representative Lambert made clear in advocating for House Bill 124 that she knew that many young people do not drive or have a driver's license or any other accepted form of identification other than student identification. And she further recognized that obtaining such identification costs money. She downplayed this expense, however, quipping that such voters can "simply go down to the DMV and get an ID card. It costs $10-15, which is the cost of 2-3 Starbucks drinks."

46.     Senator Herndon, House Bill 124's Senate sponsor, argued that student identification often does not list a residential address. But passports also do not list an address, yet they remain an accepted form of identification for voting.

47.     Senator Herndon also referred to the removal of student identification as addressing "low-hanging fruit" in protecting election integrity. He claimed that student identification cards are

not uniform and do not always require the same documentation and proof of residency requirements as state-issued identification cards.

48.     But Secretary McGrane testified that the Boise and West Ada School Districts, the state's largest school districts, have student identification card processing requirements that are similar to those for state identification cards. Secretary McGrane also testified that there were concerns about student identification security at only "*some* of our universities" (emphasis added), and that his office has already been working with universities to address any concerns about the security of student identification. The solution, Secretary McGrane explained, could just be to "bolster the process for student IDs."

49.     If in fact the legislature was merely concerned with the security of student identification, it could have addressed this in myriad other ways short of prohibiting student identification, including through improvements to student identification that were already in process, as reflected by Secretary McGrane's testimony.

**C. Rising Political Engagement by Young Idahoans**

50.     House Bill 124 and House Bill 340 come amidst a surge in political participation and activism by young Idahoans. Driven by concern over pressing issues like gun violence and abortion rights, and thanks in part to the organizing work of organizations such as MFOL Idaho, young voters are registering and voting in Idaho in increasingly large numbers. Voter registration rates for new voters aged 18 to 24 increased 16% in November 2022 compared to November 2018, and voter registration rates for new voters aged 18 to 19 increased 81% in November 2022 compared to November 2018, the highest increase in the country for that age group.

51.     Young voters also have turned out at higher levels in recent elections, both in Idaho and nationally. In the 2020 general election, 50% of voters aged 18 to 29 voted, an 11-point increase from the 2016 rate of 39% and one of the highest rates of young voter turnout since the voting age

was lowered to 18, while Idaho young voters turned out at 48% in 2020, a 10-point increase from the 2016 rate of 38%. Nationally, voters aged 18 to 29 turned out to vote at 27% in 2022 and 31% in 2018, historic rates after hovering around 20% turnout in previous midterm elections since the 1990s.

52.     Young Idahoans' increasing political participation has also taken other forms. Last fall, current high school student and 18-year-old Shiva Rajbhandari was elected to the Boise School District's Board of Trustees, defeating a 47-year-old incumbent. Mr. Rajbhandari explained that he was motivated by his "sense of the value of student empowerment, that students really do deserve a voice at the table," and that "we really do have a lot to bring to the table when we're given a seat."

53.     Idaho students have also repeatedly organized to protest at the Idaho Capitol to protect transgender rights and against legislative bills limiting those rights. At these rallies, students also encouraged each other to vote and to stay politically engaged.

54.     Some students who would be personally affected by proposed bills' restrictions on certain medical care for transgender youth have shared deeply personal testimony about their experiences in front of Idaho legislators in the hopes of preventing those bills from becoming law.

55.     Students have shown up in increasingly large numbers because they feel that their "rights are on the line," and testifying is "such a critical avenue to have [youth] voices represented in government, especially a government that is passing legislation that critically affects [their] daily lives and . . . rights."

56.     This increased political activism by young Idahoans is a direct response to the legislature's growing attacks on the political interests of young people. The legislature has repeatedly taken up and sometimes passed controversial legislation on issues of particular importance to Idaho's young voters, including legislation related to reproductive health care, health care for transgender youth, participation of transgender youth in sports, blocking transgender people from changing the gender listed on their birth certificates, allowing for the prosecution of librarians and teachers for

17

providing students with books and other material deemed "harmful to minors," and now banning the use of student identification to vote. *See* 2022 Idaho S.B. 1309; 2023 Idaho H.B. 242; 2023 H.B. 71; 2022 Idaho H.B. 675; 2020 Idaho H.B. 500; 2020 Idaho H.B. 509; 2022 Idaho H.B. 666; 2023 Idaho H.B. 124. The legislature has also rolled back protections against rising gun violence—a leading cause of death among young people in Idaho—and refused to do anything to address climate change, which particularly threatens young voters' futures. Youth activists have mobilized around these issues, demanding action from legislators.

### D.  The Legislature's Recent Unprecedented Attempts to Suppress Youth Political Engagement

57.    The legislature has responded to Idaho's growing youth activism by seeking to stifle it.

58.    During the most recent legislative session, two house committees, for the first time, sharply restricted testimony by Idahoans who are not yet 18 years old.

59.    Chairman Skaug of the House Judiciary, Rules and Administration Committee explained that there would be "[n]o testimony from those under 18 unless I invite them," and that he was unhappy there were "16 year olds taking the place of 40 year olds . . . . I just want some control. To be able to get the testimony of all the adults, taxpayers in the room." In the 2022 session, Chairman Skaug sponsored House Bill 675, which would have criminalized some forms of medical care for transgender youth, even with parental consent, and which attracted extensive hostile public testimony from young Idahoans. In the 2023 session, Chairman Skaug re-introduced legislation criminalizing gender affirming care for transgender youth as House Bill 71, which drew more than two hours of contentious testimony and debate in committee, much of it from young Idahoans.

60.    Chairwoman Ehardt of the House Local Government Committee similarly announced that her committee would not hear testimony from those under 18 unless she gave permission in

advance, explaining that she did not think hearing from large numbers of young Idahoans was a good use of the legislature's time. In the 2022 session, Chairwoman Ehardt sponsored House Bill 500, which prohibits transgender women and girls from participating in women's and girls' sports, and which similarly attracted hostile public testimony from young Idahoans.

61.     In response to public outcry over these actions, Chairman Skaug later softened his policy slightly to allow testimony from young Idahoans if their parents first filled out a permission slip or accompany them for their testimony. But as young Idahoans have themselves explained, this hardly resolves the issue, because parents may often not be supportive of their children's political views or testimony on issues of particular concern to young people. Furthermore, the committee's official policy is that adult testimony may be given preference over youth testimony.

**E. Idaho's Rapid Population Growth and Legislative Hostility to New Voters**

62.     In addition to the increased activism of young voters, Idaho is experiencing a surge of new residents. Idaho was the second fastest growing state in the country last year, with 88% of its population growth coming from people moving to Idaho from other states. For five straight years before that, Idaho was the second-fastest-growing state in the country. The result is that as of last year, more than a quarter of Idaho's population was new to the state. Over the last couple years, the number of out-of-state students has also increased, jumping 21% from fall 2018 to fall 2022.

63.     Idaho's rapid growth has prompted unfounded suspicion and hostility among legislators and long-time residents about new voters registering to vote. During debates this session on House Bill 137, which would have eliminated the affidavit alternative to showing photo identification to vote, a legislator complained about someone they saw register and then vote with just "a Washington driver's license and something out of their car." In sponsoring unsuccessful legislation to restrict absentee ballots, a legislator argued that people moving to Idaho from states where absentee voting was more prevalent were opening the state up to more possible voter fraud.

And the now-chairwoman of the Idaho Republican Party justified proposed new restrictions on voter registration last year by arguing that "[e]very one of us are already registered to vote in this chamber" and "[e]verybody we know in this state is already registered to vote." College students have borne the brunt of much of this hostility. In 2018, posters at polling locations near Brigham Young University Idaho warned students not to register to vote at their college address if they had failed to register to vote at their "true domicile" without explaining that residents may claim residency after living in an election district for at least thirty days, deterring students who moved to attend college from registering to vote.

### F.   House Bill 124 and House Bill 340's Escalation of the Legislature's Targeted Efforts to Suppress Young Voters

64.    House Bill 124 and House Bill 340 are a radical escalation of the legislature's response to growing youth activism in Idaho and migration to Idaho from other states. By surgically excising student identification—and only student identification—from the list of accepted voter identification, House Bill 124 eliminates a form of identification that is available almost exclusively to young Idaho voters and that such voters are particularly likely to have. And by requiring an accepted form of photo identification to register to vote, House Bill 340 ensures that new voters will be unable to register to vote at all if they lack an accepted form of identification, while letting long-time voters keep voting whether they have identification or not.

65.    The elimination of student identification specifically targets young voters. Nationwide, 85% of full-time college students are younger than 25, and 95% of full-time college students are younger than 35. Part-time students are somewhat older, but even so, nearly 60% of part-time college students are younger than 25 and 82% are younger than 35. High school students, of course, are younger still.

66.     Young voters are also less likely to have other accepted forms of voter identification. According to the Federal Highway Administration, nationwide, only 59.7% of 18-year-olds, 68.3% of 19-year-olds, and 74.4% of 20-year-olds had a driver's license in 2021. In contrast, more than 90% of 30- to 79-year-olds had a driver's license. Only about a third of Americans of any age have a U.S. passport. And concealed-carry permits are generally available only to those 21 and older. *See* Idaho Code § 18-3302(11).

67.     Idaho also makes it difficult for people who move to Idaho from out-of-state, including out-of-state college students, to obtain an Idaho driver's license. Even drivers who already have a valid driver's license in another state must pass a visual screening test and a written knowledge test of Idaho's traffic rules to obtain an Idaho driver's license. And they may not obtain an Idaho non-driver identification card without surrendering their out-of-state license.

## FIRST CLAIM FOR RELIEF

### Twenty-Sixth Amendment
### U.S. Const. amend XXVI, 42 U.S.C. § 1983, 28 U.S.C. § 2201, 28 U.S.C. § 2202
### Denial or Abridgement of the Right to Vote on Account of Age

68.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 67 as though fully set forth herein.

69.     The Twenty-Sixth Amendment to the U.S. Constitution provides in relevant part: "The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by . . . any State on account of age."

70.     "Abridge" means to "curtail, lessen, or diminish; to reduce the extent or scope of." Oxford English Dictionary (3d ed. 2009).

71.     The Twenty-Sixth Amendment's language, providing that rights of citizens eighteen and older to vote "shall not be denied or abridged . . . by any State on account of age," mirrors the Fifteenth Amendment's prohibition on race discrimination in voting, which provides that voting

rights "shall not be denied or abridged . . . on account of race, color, or previous condition of servitude." U.S. Const., amend. XV, § 1. When the Twenty-Sixth Amendment was ratified in 1971, that language had been understood for decades to prohibit not only facially race-based restrictions but also facially race-neutral restrictions that were "motivated by a discriminatory purpose." *City of Mobile v. Bolden*, 446 U.S. 55, 62 (1980) (citing *Guinn v. United States*, 238 U.S. 347 (1915)), *superseded by statute on other grounds*, 96 Stat. 134.

72.     The Twenty-Sixth Amendment was ratified in 1971, in the context of extraordinary social upheaval driven by politically active young people. The government and older Americans first responded to that activism by trying to suppress it. The results included the 1968 student shutdown of Columbia University, the violence at the 1968 Democratic National Convention in Chicago, and the Kent State massacre. The Twenty-Sixth Amendment tried a more constructive approach. The Congress that proposed the Amendment "uniformly expressed distress at the alienation felt by some youths, and expressed hope that youth's idealism could be channelled within the political system." *Jolicoeur v. Mihaly*, 5 Cal. 3d 565, 572, 488 P.2d 1, 5 (1971). Congress believed that "some of the student unrest of recent years has led to deplorable violence and intolerance," but also that "much of this unrest reflects the interest and concern of today's youth over the important issues of our day." *Id.* at 573 (quoting S. Rep. No. 92-26, at 365–67 (1971)). And Congress concluded that "we must channel these energies into our political system and give young people the real opportunity to influence our society in a peaceful and constructive manner," lest they be driven "into a search for an alternative, sometimes violent, means to express their frustrations over the gap between the nation's ideals and actions." *Id.* at 574 (quoting S. Rep. No. 92-26, at 365–67).

73.     In debating a statutory provision similar to the Twenty-Sixth Amendment a few years before the Amendment was adopted, Congress recognized that youth political energy "is going to continue to build and grow. The only question is whether we should ignore it, perhaps leaving this

energy to dam up and burst and follow less-than-wholesome channels, or whether we should let this force be utilized by society through the pressure valve of the franchise." *Lowering the Voting Age to 18: Hearing on S.J. Res. 8, S.J. Res. 14, and S.J. Res 78 Before the Subcomm. On Const. Amends. Of the S. Comm. on the Judiciary*, 90th Cong. 3, 74 (1968) (statement of Sen. Birch Bayh). Through the Twenty-Sixth Amendment, Congress elected to channel youth political energy through the vote.

74.    As a result, the Twenty-Sixth Amendment sought "not merely to empower voting by our youths but was affirmatively to encourage their voting, through the elimination of unnecessary burdens and barriers, so that their vigor and idealism could be brought within rather than remain outside lawfully constituted institutions." *Worden v. Mercer Cnty. Bd. of Elections*, 61 N.J. 325, 344, 294 A.2d 233, 243 (1972). Congress believed that "forcing young voters to undertake special burdens . . . in order to exercise their right to vote might well serve to dissuade them from participating in the election," and thus undermine the Amendment's purpose. S. Rep. No. 92-26, at 14 (1971).

75.    Congress and the courts have recognized that the Amendment has "particular relevance for the college youth who comprise approximately 50 per cent of all who were enfranchised by this amendment." *Walgren v. Howes*, 482 F.2d 95, 101 (1st Cir. 1973) (citing 117 Cong. Rec. 5817, 5825 (1971) (statements of Sens. Charles Percy and Edward Brooke)).

76.    The Twenty-Sixth Amendment therefore not only lowers the voting age to eighteen, but also prohibits age discrimination in voting, including facially age-neutral restrictions that are motivated by an age-discriminatory purpose. *League of Women Voters v. Detzner*, 314 F. Supp. 3d 1205, 1222–23 (N.D. Fla. 2018) (holding plaintiffs were substantially likely to succeed on merits of Twenty-Sixth Amendment claim in challenge to restrictive state guidance that prohibited early voting sites on college campuses, finding the prohibition "unexplainable on grounds other than age because it bears so heavily on younger voters"); *Colo. Project-Common Cause v. Anderson*, 495 P.2d 220, 223 (Colo. 1972) (holding based on "[h]istory and reason" that the Twenty-Sixth Amendment's

"prohibition against denying the right to vote to anyone eighteen years or older by reason of age applies to the entire process involving the exercise of the ballot and its concomitants").

77.     Representative Gannon, who opposed House Bill 124 and House Bill 340, alluded to the purpose and protections of the Twenty-Sixth Amendment in House and Committee debates, repeating the sentiment "old enough to serve in our military, old enough to vote" and noting that when society does not encourage young people to get involved in the system, "that's when we have picketing, protests, disruption of government."

78.     House Bill 124 and House Bill 340 violate the Twenty-Sixth Amendment because they were motivated by a discriminatory purpose. They were both adopted in response to an unprecedented wave of political activism by young Idahoans, alongside other measures like restrictions on legislative testimony by young people that represent a clear backlash to that activism. They surgically target young Idahoans and make it harder for them to vote, because they are far more likely to have student identification, and to lack other accepted forms of voter identification, than older voters. Finally, they are inexplicable on other grounds, because the acceptance of student identification has not caused a single documented problem in the thirteen years since Idaho began requiring voter identification or in the twenty-eight years since Idaho enacted its current voter registration law. Simply put, there was no real problem to be solved, and the "solution" to the made-up problem was both under- and over-inclusive of the concerns raised, including concerns about double voting and the security of student identification.

## SECOND CLAIM FOR RELIEF

**Twenty-Fourth Amendment and Equal Protection Clause of the Fourteenth Amendment U.S. Const. amends. XIV and XXIV, 42 U.S.C. § 1983, 28 U.S.C. § 2201, 28 U.S.C. § 2202 Unconstitutional Poll Tax**

79.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 78 as though fully set forth herein.

80.     The Twenty-Fourth Amendment to the U.S. Constitution provides that "[t]he right of citizens of the United States to vote . . . for President or Vice President . . . or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax."

81.     The Twenty-Fourth Amendment "nullifies sophisticated as well as simple-minded modes of impairing the right [to vote]" and "hits onerous procedural requirements which effectively handicap exercise of the franchise." *Harman v. Forssenius*, 380 U.S. 528, 540-41 (1965) (quotation marks omitted).

82.     Under the Twenty-Fourth Amendment, no poll tax nor an "equivalent or milder substitute may be imposed" as a prerequisite to voting, and "constitutional deprivations may not be justified by some remote administrative benefit to the State," such as proving residence. *Id.* at 544.

83.     A state also violates the Equal Protection Clause of the Fourteenth Amendment "whenever it makes the affluence of the voter or payment of any fee an electoral standard" and whenever a state sets "voter qualifications which invidiously discriminate." *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 666 (1966).

84.     The Supreme Court has noted that "[t]he fact that most voters already possess a valid driver's license, or some other form of acceptable identification, would not save [a] statute . . . if the State required voters to pay a tax or a fee to obtain a new photo identification." *Crawford*, 553 U.S. at 198.

85.     House Bill 340 imposes an unconstitutional poll tax in violation of the Twenty-Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment by requiring some voters to pay a fee for a state- or federal-issued identification card to register to vote. While House Bill 340 provides for free identification cards for some voters, such cards are unavailable to voters who turn 18 shortly before an election or who no longer drive and would otherwise not renew their driver's

licenses. Under House Bill 340, such voters must pay Idaho or the federal government for an identification card if they wish to vote.

86.     The affidavit provision in Idaho Code § 34-1114 allows an already registered voter to vote without showing identification, but no similar alternative is available to new registrants.

### THIRD CLAIM FOR RELIEF

**Equal Protection Clause of the Fourteenth Amendment**
**U.S. Const. amend XXVI, 42 U.S.C. § 1983, 28 U.S.C. § 2201, 28 U.S.C. § 2202**
**Unconstitutional Discrimination Against New Registrants**

87.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

88.     House Bill 340 violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by discriminating against new registrants as compared with existing voters. Under House Bill 340, new registrants must show one of four forms of identification to register to vote, with no exceptions. In contrast, existing registrants do not need to show any identification, because they can instead sign an affidavit attesting to their name and residency.

89.     This discrimination is intentional. Many legislators who supported House Bill 340 also opposed House Bill 137, which would have eliminated the affidavit alternative for existing registrants. Those legislators explained that requiring identification to vote would disenfranchise themselves and their friends and relatives, who might forget or fail to timely renew their identification cards. House Bill 340 will disenfranchise new registrants, while leaving existing voters free to vote without identification.

90.     Discriminatory voting provisions are subject to heightened scrutiny under the *Anderson-Burdick* balancing test that governs constitutional challenges to voting laws. Courts have "upheld generally applicable and *even-handed restrictions* that protect the integrity and reliability of the electoral process itself." *Hussey v. City of Portland*, 64 F.3d 1260, 1265 (9th Cir. 1995) (emphasis

26

added) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 n.9 (1983)). And "reasonable, *nondiscriminatory* restrictions upon the First and Fourteenth Amendment rights of voters" are often justified by "important regulatory interests." *Id.* (emphasis added) (quoting *Burdick v. Takushi*, 504 U.S. 428, 434). In contrast, restrictions that "disproportionately affect[]" a particular group of voters and severely interfere with their voting rights are subject to strict scrutiny. *Id.* at 1266.

91.     In assessing a law under *Anderson-Burdick*, the Court must carefully balance the character and magnitude of injury to the right to vote with the justifications put forth by the State for the burdens imposed. *See Burdick*, 504 U.S. at 434; *Anderson*, 460 U.S. at 789. The Court "must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson*, 460 U.S. at 789. "However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford*, 553 U.S. at 191 (quotation marks omitted).

92.     House Bill 340 singles out new voters and imposes heightened burdens on them, while exempting existing registrants. And the burdens it imposes on new voters are severe. New registrants must possess one of just a few forms of photo identification before they may register to vote. In some cases, they will need to pass an Idaho driver's test, or else surrender a valid out-of-state license for a non-driver identification card, to get an approved identification card. New registrants who lack approved identification will be unable to register to vote.

93.     Idaho legislators recognized that requiring such limited forms of identification would disenfranchise voters, and for that reason maintained an exemption for existing registrants.

94.     There is no legitimate, neutral justification for House Bill 340's differential treatment between new and existing registrants. The supposed problem that voter identification requirements address is in-person impersonation, and that problem is equally present for new and existing

registrants alike. And while legislators also expressed concerns about proof of residency, Idaho law before House Bill 340 already required proof of residency for many forms of voter registration. There is no evidence that this existing requirement was inadequate or that Idaho suffered from any meaningful problem of non-residents registering to vote and voting in its elections.

95.     Instead, House Bill 340 was motivated by legislators' illegitimate suspicion of new voters and their preference for Idaho's long-time residents over young voters and new arrivals. That is a constitutionally illegitimate interest. *See Crawford*, 553 U.S. at 203 (explaining that if partisan "considerations had provided the only justification for a photo identification requirement, we may also assume that [it] would suffer the same fate as the poll tax at issue in *Harper*").

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

a)  declaring, under the authority granted to this Court by 28 U.S.C. § 2201, that House Bill 124's and House Bill 340's elimination of student identification as a form of voter identification violates the Twenty-Sixth Amendment to the U.S. Constitution;

b)  declaring, under the authority granted to this Court by 28 U.S.C. § 2201, that House Bill's 340's requirement of photo identification to register to vote is an unconstitutional poll tax in violation of the Twenty-Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution;

c)  declaring, under the authority granted to this Court by 28 U.S.C. § 2201, that House Bill 340's requirement of photo identification to register to vote unconstitutionally discriminates against new registrants as compared to existing registrants in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution;

d)  enjoining the Secretary, under the authority granted to this Court by 28 U.S.C. § 2202, from enforcing House Bill 124, and from enforcing House Bill 340's requirement of photo identification to register to vote;

e)  awarding Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

f)  granting such other and further relief as the Court deems just and proper.

Dated: April 17, 2023                    Respectfully submitted,

                                         /s/ Terri R. Pickens

                                         Terri R. Pickens (ISB #5828)
                                         **PICKENS LAW, P.A.**
                                         398 S. 9th Street, Suite 240
                                         Boise, ID 83702
                                         terri@pickenslawboise.com
                                         Tel: (208) 954-5090
                                         Fax: (208) 954-5099

                                         Elisabeth Frost*
                                         David R. Fox*
                                         Justin Baxenberg*
                                         Daniel Cohen*
                                         Qizhou Ge*
                                         **ELIAS LAW GROUP LLP**
                                         250 Massachusetts Avenue NW, Suite 400
                                         Washington, D.C. 20002
                                         efrost@elias.law
                                         dfox@elias.law
                                         jbaxenberg@elias.law
                                         dcohen@elias.law
                                         age@elias.law
                                         Tel: (202) 968-4490

                                         *Attorneys for Plaintiffs*
                                         *\*Admitted pro hac vice*