UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MARCH FOR OUR LIVES IDAHO and IDAHO ALLIANCE FOR RETIRED AMERICANS,<br><br>   Plaintiff,<br><br>  v.<br><br>PHIL MCGRANE, in his official capacity as the Idaho Secretary of State,<br><br>   Defendant. | Case No. 1:23-cv-00107-AKB<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

  Plaintiffs March for Our Lives Idaho ("MFOL Idaho") and Idaho Alliance for Retired Americans (the "Alliance") filed this action against Defendant Phil McCrane, the Idaho Secretary of State (the "Secretary"). Plaintiffs challenge House Bill 124 and House Bill 340, which are recent amendments by the Idaho Legislature to Idaho's voter laws. Plaintiffs allege that both Bills violate the Twenty-Sixth Amendment to the United States Constitution and that House Bill 340 is an unconstitutional poll tax in violation of the Twenty-Fourth Amendment and violates the Equal Protection Clause of the Fourteenth Amendment. Based on these allegations, Plaintiffs assert claims under 42 U.S.C. § 1983 and seek declaratory and injunctive relief. In response, the Secretary moves to dismiss Plaintiffs' action under Federal Rules of Civil Procedure 12(b). For the reasons discussed below, the Court denies the Secretary's motion.

## BACKGROUND

**A. House Bill 340—Identification of Applicants Registering to Vote**

  Idaho law requires all applicants registering to vote in Idaho to provide proof of identity and Idaho residency. Idaho Code § 34-411(1), (3), (4). Previously, registrants could provide either a driver's license, a state-issued identification card, or the last four digits of the registrant's social security number to prove their identity. I.C. § 34-411(1)(h) (2012). During the 2023 Idaho

MEMORANDUM DECISION AND ORDER - 1

legislative session, however, the Idaho Legislature passed House Bill 340, amending I.C. § 34-411 regarding the requisite information necessary to prove residency and, at issue here, to prove identity. 2023 IDAHO H.B. 340 § 5.

As of July 1, 2023, applicants registering to vote must now prove their identity by showing either: (1) an Idaho driver's license; (2) a United States passport or identification card; (3) a tribal identification card; or (4) an Idaho license to carry a concealed weapon. I.C. § 34-411(3)(a)-(d). Generally, to obtain any of these forms of government-issued identification, an individual must pay a fee. (Dkt. 20 at ¶ 24). To address this issue, the Idaho Legislature also passed House Bill 340, amending I.C. § 49-2444 to provide a "no-fee identification card" to any individual who is eighteen years of age or older, "who has not possessed a current driver's license in the preceding six months," and who needs an identification card to comply with "voter registration or voting requirements." 2023 IDAHO H.B. 340 § 8.

**B.     House Bill 124—Registered Voter Identification**

Idaho law also requires registered voters to provide personal identification when voting at the polls. I.C. § 34-1113. Presently, the acceptable forms of identification at the polls include: (1) an Idaho driver's license; (2) a United States passport or identification card; (3) a tribal identification card; (4) a current student identification card, with photograph, issued by an Idaho high school or institute of higher education; or (5) an Idaho license to carry a concealed weapon. I.C. § 34-1113(1)-(5). During the 2023 Idaho legislative session, however, the Idaho Legislature passed House Bill 124 amending I.C. § 34-1113 to eliminate a student identification card as an acceptable form of identification for voting purposes. 2023 IDAHO H.B. 124 § 1. This amendment becomes effective on January 1, 2024. Despite the requirement that registered voters must present government-issued identification at the polls, Idaho law provides that a voter who is unable to present such identification may complete an affidavit providing their name and address in lieu of providing personal identification.[1] I.C. § 34-1114.

**C.     Plaintiff March for Our Lives Idaho**

MFOL Idaho is a student-led organization that, according to Plaintiffs' allegations, "harnesses the power of young people to fight for common sense solutions to end gun violence in Idaho." (Dkt 20 at ¶ 11). The organization "is led by a board of six young activists, and its

---

[1]     Idaho Code § 34-1114 further provides that "any person who knowingly provides false, erroneous or inaccurate information on such affidavit shall be guilty of a felony."

MEMORANDUM DECISION AND ORDER - 2

constituents include hundreds of supporters and volunteers registered with the organization who have pledged to take action to end gun violence and who benefit from, share in, and help guide the organization's priorities and activities." (*Id.*). MFOL Idaho organizes "advocacy campaigns" and "events, rallies, protests, and trainings"; "its board of members and volunteers testify [before] the state legislature to advocate for laws and policies to end gun violence"; and it "conducts voter registration and voter turnout activities, targeting its efforts on young voters." (*Id.*).

D. **Plaintiff Idaho Alliance for Retired Americans**

The Alliance, according to Plaintiffs' allegations, is a nonprofit organization with a mission of protecting retirees' civil rights and ensuring they obtain "social and economic justice." (*Id.* ¶ 13). It has 11,407 members, including retirees "from public and private sector unions, community organizations, and individual activists." (*Id.*) "The Alliance and its individual members spend resources on voter registration, get-out-the-vote activities, and other voter engagement and education activities directed at its members and other elderly Idahoans." (*Id.* at ¶ 15). They also "spend resources on recruiting new members, opening new chapters, making presentations to members, and promoting substantive policy campaigns in areas such as retirement income security, pension protections, social security, Medicare, Medicaid, and services for older Idahoans." (*Id.*). Many of the Alliance's members are elderly, no longer drive, and do not need or wish to renew their driver's licenses. (*Id.* at ¶ 14). Some members are new to Idaho and have not yet registered to vote in Idaho. (*Id.*). Others anticipate needing to re-register because they have moved to a new address or have not voted in the last four years. (*Id.*).

E. **Procedural Background**

MFOL initially filed this action against the Secretary in March 2023, immediately following the Idaho Legislature's passage of House Bill 124. (Dkt. 1). Then in April 2023, when the Legislature passed House Bill 340, the Alliance joined MFOL as a plaintiff, and they amended the complaint to include allegations that House Bill 340 also violates the U.S. Constitution. (Dkt. 20). In the amended complaint, Plaintiffs allege three claims for relief under 42 U.S.C. § 1983.

The First Claim alleges House Bill 124 and House Bill 340 violate the Twenty-Sixth Amendment. (Dkt. 20 at ¶¶ 68-78). The Twenty-Sixth Amendment provides, in relevant part, that "the right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." U.S. Const. amend. XXVI, § 1. In support, Plaintiffs allege "House Bill 124 and House Bill 340 violate the Twenty-

MEMORANDUM DECISION AND ORDER - 3

Sixth Amendment because they were motivated by a discriminatory purpose"; "[t]hey were both adopted in response to an unprecedented wave of political activism by young Idahoans [and] represent a clear backlash to that activism"; and "[t]hey surgically target young Idahoans and make it harder for them to vote, because they are far more likely to have student identification, and to lack other accepted forms of voter identification, than older voters." (Dkt. 20 at ¶ 78).

In their Second Claim, Plaintiffs allege House Bill 340 violates the Twenty-Fourth Amendment. This Amendment provides a citizen's right to a vote for President, Vice President, or a member of Congress "shall not be denied or abridged . . . by reason of failure to pay any poll tax or other tax." U.S. Const. amend. XXIV, § 1. Plaintiffs allege House Bill 340 unconstitutionally requires "some voters to pay a fee for a state- or federal-issued identification card to register to vote." (Dkt. 20 at ¶ 85). Further, Plaintiffs allege the "no-fee-identification card" under I.C. § 49-2444 does not remedy the poll tax because "such cards are unavailable to voters who turn 18 shortly before an election or who no longer drive and would otherwise not renew their driver's licenses." (Dkt. 20 at ¶ 85).

Finally, Plaintiffs allege in their Third Claim for relief that House Bill 340 violates the Equal Protection Clause of the Fourteenth Amendment "by discriminating against new registrants as compared with existing voters." (Dkt. 20 at ¶ 88). Specifically, they allege "new registrants must show one of four forms of identification to register to vote, with no exceptions," while "existing registrants do not need to show any identification because they can instead sign an affidavit attesting to their name and residency." (*Id*.). Further, Plaintiffs allege "no legitimate, neutral justification for House Bill 340's differential treatment of new and existing registrants" exists. (Dkt. 20 at ¶ 94). Plaintiffs seek declaratory relief that both House Bill 124 and House Bill 340 are unconstitutional and an injunction enjoining their enforcement. (Dkt. 20 at pp. 28-29 (prayer for relief)).

In response to Plaintiffs' amended complaint, the Secretary filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1). The Secretary argues that Plaintiffs lack Article III standing because they have not alleged "a concrete and particularized injury in fact"; their claims are not redressable against the Secretary because he "lacks authority over actual voter

MEMORANDUM DECISION AND ORDER - 4

registrations"; and their challenge is not ripe.[2]  With his motion to dismiss, the Secretary filed the Declaration of Phil McCrane, attaching a summary of "the types of identification used by voters at the polls in Idaho during the 2022 general election." (Dkt. 29-2 at ¶ 4).

## LEGAL STANDARD

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides a defendant may move to dismiss an action for "lack of subject-matter jurisdiction." Courts "have an independent obligation to determine whether subject-matter jurisdiction exists." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). A motion to dismiss for lack of standing is properly brought under Rule 12(b)(1) because standing is a jurisdictional matter. Fed. R. Civ. P. 12(b)(1). The plaintiff bears the burden of establishing subject-matter jurisdiction exists. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

"Under Rule 12(b)(1), a defendant may challenge the plaintiff's jurisdictional allegations in one of two ways. A 'facial' attack accepts the truth of the plaintiff's allegations but asserts that they are insufficient on their face to invoke federal jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (citation omitted). "A 'factual' attack, by contrast, contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings." *Id.*

As a threshold matter, the Court addresses whether the Secretary's jurisdictional attack presents a facial or factual challenge. In his motion to dismiss, the Secretary does not identify the nature of his jurisdictional challenge as either facial or factual. In his briefing, however, he repeatedly argues Plaintiffs failed to make key allegations in support of their standing.[3] At oral argument, the Secretary argued for the first time that he is factually attacking Plaintiff's standing allegations and noted he had filed his declaration in support of the motion.

---

[2]  The Secretary also moved under Federal Rule of Civil Procedure 12(b)(2) and 12(b)(5), arguing he was not subject to personal jurisdiction because Plaintiffs did not properly serve process on him. He has conceded this argument on reply, however.

[3]  For example, the Secretary argues Plaintiffs do not allege any injury in support of either associational or organizational standing (Dkt. 29-1 at p. 14); "neither Plaintiff has alleged any basis to sue 'as the representative of its members'" (*id.* at p. 15); "MFOL Idaho does not even allege that it *has* any members" (*id.* at p. 16); "MFOL Idaho has not alleged any concrete or particularized harm" (*id.* at p. 20); and Plaintiffs "do not allege any specific efforts they have undertaken or will undertake to educate about the law." (Dkt. 36 at p. 5).

MEMORANDUM DECISION AND ORDER - 5

That declaration states the Secretary's office "maintains the computerized statewide voter registration system," "certifies the electronic poll books," and has knowledge of the electronic poll book database." (Dkt. 29-2 at ¶ 3). It attaches an exhibit which the Secretary attests contains "information obtained from the electronic pool book database." (*Id.* at ¶ 4). The exhibit shows a "manual search" indicating 104 voters used a student identification card to vote in the 2022 general election. (Dkt. 29-3). The Secretary asserts that his declaration makes his jurisdictional challenge a factual attack and that Plaintiffs must refute that attack with evidence.

The Court disagrees the Secretary has mounted a factual attack to Plaintiffs' standing. "A factual attack requires a factual dispute." *Const. Party of Pennsylvania v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014); *see also Leite*, 749 F.3d at 1121 (noting in jurisdictional attack under Rule 12(b)(1) that "the plaintiff's factual allegations will ordinarily be accepted as true unless challenged by the defendant"); *Courthouse News Serv. v. Planet*, 750 F.3d 776, 780 (9th Cir. 2014) (noting factual challenge relies on affidavits or other evidence "contest[ing] the truth of the complaint's allegations"). Although the Secretary has presented information in his declaration showing the types of identification Idaho voters used at the polls in the 2022 general election, none of that information disputes the truth of Plaintiffs' standing allegations. Rather, the Secretary's declaration supports Plaintiffs' position that some voters use student identification for purposes of voting.

Moreover, in response to the Secretary's motion, Plaintiffs specifically characterized his challenge to their Article III standing as a facial challenge and noted the appropriate standard for such a challenge—acceptance of all their allegations as true for purposes of resolving the motion. (Dkt. 34 at p. 11). On reply, the Secretary did not dispute this characterization. (*See generally* Dkt. 36). Accordingly, the Court analyzes the Secretary's challenge to jurisdiction as a facial attack and accepts Plaintiffs' allegations as true for purposes of resolving the Secretary's Rule 12(b)(1) motion.

## ANALYSIS

**A.     Article III Standing**

Article III of the United States Constitution limits the scope of federal judicial power to the adjudication of cases and controversies. U.S. Const. art. III, § 2. A fundamental safeguard of that limitation is the doctrine of standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see also E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 765 (9th Cir. 2018)

("*EBSC I*"). "The Article III standing inquiry serves a single purpose: to maintain the limited role of courts by ensuring they protect against only concrete, non-speculative injuries." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 662 (9th Cir. 2021) ("*EBSC II*") (citing *Lujan*, 504 U.S. at 583). "Whether a plaintiff has standing (and thus, whether the court has jurisdiction) is a threshold question that is distinct from the merits of [the] claim." *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 878-79 (9th Cir. 2022) (internal quotation marks omitted).

An organization may assert standing either on behalf of its members, which is referred to as associational standing, or directly on its own behalf, which is referred to as organizational standing. *EBSC II*, 993 F.3d at 662 ("Organizations can assert standing on behalf of their own members, or in their own right." (citations omitted)). To determine whether an organization meets the constitutional minimum requirements for standing, courts conduct the same three-fold inquiry for determining an individual's standing. *Id.* First, the plaintiff must have suffered an injury-in-fact—an invasion of a legally protected interest, which is concrete and particularized and which is actual or imminent, not conjectural or hypothetical. *Lujan*, 504 U.S. at 560. Second, a causal connection between the injury and the defendant's conduct must exist; i.e., the injury must be fairly traceable to the defendant's challenged action. *Id.* Third, a favorable decision will likely redress the injury. *Id.* at 561.

**1. Organizational Standing**

An organization, such as Plaintiffs in this case, may establish direct, organizational standing to sue on its own behalf by alleging a diversion-of-resources injury. *EBSC II*, 993 F.3d at 663. Under that theory, an organization establishes standing by alleging the defendant's behavior frustrates the organization's mission and causes it to divert resources in response to that frustration of purpose. *Id.* "Organizations are not required to demonstrate some threshold magnitude of their injuries," however. *Id.* at 664. Rather, "a diversion-of-resources injury is sufficient to establish organizational standing at the pleading stage, even when it is 'broadly alleged.'" *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015) ("*La Raza*") (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

Further, organizational standing requires "only a minimal showing of injury." *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007). Indeed, the Ninth Circuit stated in one case that a concrete, redressable harm "amount[ing] to pennies" is sufficient. *EBSC II*, 993 F.3d at 663, 664; *see also EBSC I*, 932 F.3d at 765 (noting allegation of perceptibly impaired

ability to provide services is sufficient to confer standing); *Crawford*, 472 F.3d at 951 ("The fact that the added cost has not been estimated and may be slight does not affect standing."). Also, an alleged "*risk* or *threat* of an injury is sufficient to satisfy the actual injury requirement" at the very preliminary stage of the case if that risk or threat is "certainly impending." *EBSC I*, 932 F.3d at 764; *see also Tingley v. Ferguson*, 47 F.4th 1055, 1066 (9th Cir. 2022) (noting when plaintiff alleges future injury, threatened injury must be certainly impending or cause substantial risk of harm).

    a.    **MFOL**

The Secretary argues Plaintiffs lack organizational standing because they "do not allege a concrete and particularized injury in fact." (Dkt. 29-1 at p. 7). Regarding MFOL, the Secretary asserts voter registration is "ancillary" to MFOL's mission, and MFOL "fails to adequately allege 'diverted resources,'" because it did not identify any "specific projects" from which it diverted resources. (*Id.* at pp. 19-20). In support of the Secretary's assertion that MFOL must but failed to allege a specific project from which it diverted resources, the Secretary cites *Texas State LULAC v. Elfant*, 52 F.4th 248 (5th Cir. 2022).

In *Elfant*, two organizations challenged Texas' "revised requirements for voter residency." *Id.* at 251. After the district court granted the organizations' summary judgment motion, Texas appealed to the Fifth Circuit, challenging their organizational standing. *Id.* at 253. The Fifth Circuit noted that "an organization can show standing via diversionary injury by identifying specific projects that it had to put on hold or otherwise curtail in order to respond to the challenged laws." *Id.* (quotations and brackets omitted). It found, however, that testimony of the organizations' representatives failed to link the organizations' claimed diversion of resources to the challenged laws. *Id.* at 254. It ruled that "an organizational plaintiff must show it diverted resources 'as a direct result of' the challenged law." *Id.* Based on the evidence presented on summary judgment, the Fifth Circuit ruled the plaintiffs failed "to satisfy the traceability and redressability prongs of Article III standing." *Id.*

*Elfant* is inapplicable in this case for at least three reasons. First, the Fifth Circuit was considering evidence on summary judgment in *Elfant*, and this case has not yet reached that stage. While Plaintiffs bear the burden of establishing the elements of standing "with the manner and degree of evidence required at the successive stages of litigation," *Lujan*, 504 U.S. at 561, Plaintiffs may rely on their allegations of a risk or threat of injury to satisfy the actual injury requirement at

this stage of the case. *See EBSC I*, 932 F.3d at 764 (noting plaintiff need only establish risk or threat of injury to satisfy actual injury requirement).

Second, the Fifth Circuit concluded in *Elfant* that the plaintiffs failed to present evidence to establish the traceability and redressability requirements for standing. 52 F.4th at 254. In contrast, the Secretary in this case is challenging Plaintiffs' failure to adequately plead an injury-in-fact. Third, the Secretary fails to cite any binding authority that Plaintiffs must specifically identify projects from which they have diverted resources to establish organizational standing at this initial pleading stage of the case. Because the Ninth Circuit has not adopted a rule that an organization must allege the specific project from which it diverted resources to allege an injury-in-fact, this Court declines to impose such a rule on Plaintiffs.

In this case, MFOL has adequately alleged a diversion-of-resources injury to establish organizational standing. Specifically, MFOL alleges it "conducts voter registration and voter turnout activities" to further its mission to harness "the power of young people to fight for common sense solutions to end gun violence in Idaho"; both House Bill 124 and House Bill 340 "make it harder"[4] for voters who possess only student identification cards to register and to vote; and MFOL will have to "divert resources towards voter education from other programming to ameliorate the law's disenfranchising and vote suppression impacts." (Dkt. 20 at ¶¶ 11-12). These allegations satisfy organizational standing at this stage of the proceedings, even if only "broadly alleged." *See La Raza*, 800 F.3d at 1040 (ruling broadly alleged diversion-of-resource injury sufficient at pleading stage to confer standing).[5]

---

[4] The Secretary takes issue with MFOL's use of the phrase "make it harder" for eligible voters to register and to vote. (Dkt. 29-1 at p. 19). The Court, however, does not find this phrase is meaningfully distinguishable from the case law's use of the phrase "frustration of purpose." *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021) (using phrases "frustration of purpose" and "frustrated [the organization's] mission"). The Court construes MFOL's allegations as asserting that House Bill 124 and House Bill 340 frustrate its purpose of registering voters, in particular young voters, who support its objective of reducing gun violence.

[5] The Secretary argues this case is distinguishable from *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032 (9th Cir. 2015), because Plaintiffs do not allege "a 'precipitous' drop in voting registration in Idaho, among young people or otherwise." (Dkt. 36 at p. 5). *La Raza*, however, does not stand for the proposition, as the Secretary argues, that a plaintiff must allege a precipitous drop in voting registration (or any other quantification of registrants) to establish standing. Rather, *La Raza* reiterates that the Ninth Circuit has "made clear that a diversion-of-

a. **The Alliance**

Regarding the Alliance's standing allegations, the Secretary argues these allegations are defective for the same reasons as MFOL's allegations. (Dkt. 29-1 at p. 20). As discussed above, however, those arguments fail. Further, the Secretary argues the Alliance fails to "explain how" the new laws "make it more difficult for the Alliance and its members to associate to effectively further their shared political goals." (*Id.*) (quotations omitted). The Secretary's argument, however, overlooks the Alliance's diversion-of-injury allegations.

Those allegations include: "Alliance's mission is to protect the civil rights of retirees and ensure that they obtain social and economic justice." (Dkt. 20 at ¶ 13). In support of this mission, Alliance "spend[s] resources on recruiting new members, opening new chapters, making presentations to members, and promoting substantive policy campaigns in areas such as retirement income security, pension protections, social security, Medicare, Medicaid, and services for older Idahoans." (*Id.* at ¶ 15). "House Bill 340 frustrates the Alliance's mission by impeding its members' ability to vote [and] threatening the electoral prospects of the candidates the Alliance endorses" and "will force the Alliance to divert resources away from these activities and towards educating its members about the stricter voter registration requirements. . . ." (*Id.*). These allegations, like MFOL's allegations, satisfy organizational standing at this stage of the proceedings. *See La Raza*, 800 F.3d at 1040 (ruling broadly alleged diversion-of-resource injury sufficient at pleading stage to confer standing).

2. **Associational Standing**

Because Plaintiffs allege organizational standing, they need not also have associational standing. Regardless, their allegations are sufficient to establish associational standing at this stage of the proceedings. Associational standing arises "[w]here it is relatively clear, rather than merely speculative, that one or more [of the organization's] members have been or will be adversely affected by a defendant's action." *La Raza*, 800 F.3d at 1041. To invoke associational standing on behalf of its members, a plaintiff must allege facts demonstrating that: "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires

---

resources injury is sufficient to establish organizational standing at the pleading stage, even when it is 'broadly alleged.'" 800 F.3d at 1040.

the participation of individual members in the lawsuit." *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1096 (9th Cir. 2021).

"Implicit in the first prong of this test is the requirement that an organization must generally have 'members' to bring suit on their behalf." *Or. Moms Union v. Brown*, 540 F. Supp. 3d 1008, 1013 (D. Or. May 20, 2021). A formal membership, however, is not always required for associational standing. *Am. Unites for Kids*, 985 F.3d at 1096. Rather, an organization without a formal membership may have associational standing if "the organization is sufficiently identified with and subject to the influence of those it seeks to represent as to have a personal stake in the outcome of the controversy." *Id.* Courts consider whether the individuals, who the organization purports to represent, possess the indicia of membership necessary to satisfy the purposes undergirding the concept of associational standing. *Or. Moms Union*, 540 F. Supp. 3d at 1013.

For example, in *Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1111 (9th Cir. 2003), the Ninth Circuit concluded that a non-membership organization "serve[d] a specialized segment" of a community, who were "the primary beneficiaries of [the organization's] activities"; the organization was "the functional equivalent of a voluntary membership organization"; and as a result, it had associational standing. Under associational standing, an organization need not identify the injured member to establish standing if "it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by the defendant's action" and the defendant does not need to know "the identity of a particular member to understand and respond to an organization's claim of injury." *La Raza*, 800 F.3d at 1041.

Despite not alleging a formal membership, MFOL's allegations are sufficient to establish it represents individuals possessing indicia of membership. Those allegations include that MFOL is a "student-led organization" with "constituents" including "hundreds of supporters and volunteers registered with the organization," "who guide the organization's priorities and activities." (Dkt. 20 at ¶ 11). The specialized segment of the community MFOL serves are "young activists who are deeply concerned by and impacted by rising gun violence" and they are its primary beneficiaries. (*Id.*) MFOL alleges at least some of its members would have standing to sue in their own right by alleging a segment of its constituents will be injured by the new laws. (*See, e.g., id.* at ¶¶ 78, 85) (alleging "young Idahoans . . . are far more likely to have student identification, and to lack other accepted forms of voter identification" and "voters who turn 18 shortly before an election" would be subject to poll tax).

MEMORANDUM DECISION AND ORDER - 11

Similarly, the Alliance's allegations are also sufficient to establish associational standing. The Alliance alleges it has "11,407 members, made up of retirees from public and private sector unions, community organizations, and individual activities." (*Id.* at ¶ 13). Among these members are, for example, "voters who currently have driver's license but who no longer drive and would like to stop renewing their driver's license" and "voters who move to Idaho shortly before election day and have not yet converted their still-valid-out-of-state license, which requires passing a written test." (*Id.* at ¶ 25). The Alliance alleges "House Bill 340 will require all those eligible voters to pay for an identification card if they wish to register to vote." (*Id.*). Accordingly, the Alliance, like MFOL, has sufficiently alleged associational standing.

### 3. Redressability

The Secretary also challenges the "redressability" element of Plaintiffs' Article III standing. He argues Plaintiffs' injuries are not redressable by relief against him because he "has only limited authority over voter registration."[6] He contends that, although he is the "chief election officer" who "is responsible to issue 'directives' to county election officials," the county clerks are "the primary responsible officials for accepting voter registrations and overseeing voter requirements in elections" and only joining county clerks would "ensure that any registration would ultimately be accepted." (Dkt. 29-1 at p. 21).

"Redressability is satisfied so long as the requested remedy would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Mecinas v. Hobbs*, 30 F.4th 890, 900 (9th Cir. 2022) (quoting *Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012)) (internal quotation marks omitted). "[R]edressability analyzes the connection between the alleged injury and requested relief." *Mecinas*, 30 F.4th at 899. "Plaintiffs need not demonstrate that there is a guarantee that their injuries will be redressed by a favorable decision." *Id.* at 900 (quoting *Renee*, 686 F.3d at 1013) (internal quotation marks omitted).

---

[6] The Secretary also argues Plaintiffs cannot allege redressability because the Department of Motor Vehicles will administer the new free identification card. (Dkt. 29-1 at p. 22). Plaintiffs respond, however, that they are not challenging the free identification card but rather argue it "does not eliminate the constitutional problems with the changes to voter registration and voter identification requirements." (Dkt. 34 at p. 21). The Court agrees Plaintiffs' argument about the free identification card does not undermine redressability.

MEMORANDUM DECISION AND ORDER - 12

The decision in *Mecinas* is instructive in this case. *Mecinas* involved a challenge to an Arizona statute designating the order in which candidates were to be listed on voting ballots. 30 F.4th at 894. Challenging this statute, the plaintiffs sued the Arizona secretary of state, who asserted the plaintiffs could not allege redressability. *Id*. at 899. In support, the secretary argued that, although she prepared the manual requiring counties to order candidates' names on the ballots in accordance with the statute, "her ability to adhere to a court's injunction may be stymied by the governor or the attorney general," both of whom must approve the manual before it goes into effect. *Id.* at 900. The Ninth Circuit rejected this argument, noting that the secretary has statutorily delegated authority to prescribe rules for producing and disturbing ballots and that the counties would have no choice but to follow her mandate directing them to order the ballots per a court injunction. *Id.* As a result, the Ninth Circuit reasoned the plaintiffs had met their burden of alleging redressability because an injunction against the secretary would significantly increase their likelihood of relief. *Id.*

*Mecinas* compels the same result here. Like Arizona law, Idaho law requires the Secretary to prepare and distribute directives and instructions to each county clerk. Specifically, it provides that "the secretary of state shall cause to be prepared and distributed to each county clerk detailed and comprehensive written directives and instructions relating to and based upon the election laws as they apply to elections, registration of electors and voting procedures which by law are under the direction and control of the county clerk." I.C. § 34-202. Because Idaho law mandates that the Secretary issue binding directives on all aspects of election law to county clerks and requires them to follow those directives, an injunction against the Secretary would "significantly increase the likelihood" of Plaintiffs' requested relief. Thus, the Secretary's statutory authority provides enough basis for redressability under Plaintiffs' allegations.

The Secretary attempts to distinguish *Mecinas* by arguing that, unlike Arizona's law, he "has only limited ability to compel compliance with his mandates" because he does not have criminal enforcement authority and "can only compel compliance through a writ of mandamus." (Dkt. 36 at pp. 9, 10) (citing I.C. § 34-213(1)). He contends that, because a contested mandamus action "is a far cry from the immediate criminal penalty," "an injunction would not give Plaintiffs legally enforceable protection from the allegedly imminent harm." (*Id.* at p. 10). The Secretary's attempt to distinguish *Mecinas*, however, is flawed for several reasons.

MEMORANDUM DECISION AND ORDER - 13

First, the Ninth Circuit's decision in *Mecinas* did not turn on the source of the Arizona secretary's enforcement power. Rather, what mattered for redressability purposes was that the secretary had "the statutorily delegated authority" to promulgate rules for statewide elections, and the county supervisors were bound by law to follow the secretary's mandates. *Mecinas*, 30 F.4th at 900. The same is true in Idaho. *See* I.C. § 34-202.

Second, the Secretary's argument asks this Court to assume the county clerks will ignore state law and refuse to follow the Secretary's directives simply because they might not face immediate criminal penalties. The Court declines to make that assumption. Questions of redressability should not "turn on such compliance-related considerations" like whether a county clerk would ignore her legal obligations. *C.f. Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 882 (2000) (assuming compliance with the law). Rather, this Court will assume the county clerks' compliance with Idaho law.

Third, the Secretary's argument ignores that a county clerk who fails to follow the Secretary's directive relating to elections could be prosecuted and face criminal penalties in some circumstances. *See* I.C. § 34-212(2) ("If the prosecuting attorney . . . determines that the county clerk has failed to comply with a lawful directive or instruction prepared and distributed or given under the authority of the secretary of state . . . the prosecuting attorney shall promptly proceed to prosecute such violation by the county clerk."). Regardless, even without the potential for criminal penalties, the Secretary's directives are not toothless. As the Secretary acknowledges, he has the power to compel compliance through a mandamus action, I.C. § 34-213, or he can refer a county clerk's noncompliance to the prosecuting attorney, who can order the clerk's compliance. I.C. § 34-212(1). Finally, as the Ninth Circuit explained in *Mecinas*, whether a county clerk's unlawful refusal to follow the Secretary's directive would stymie the Secretary's ability to adhere to a court's injunction "is of no moment." *Mecinas*, 30 F.4th at 900.

In summary, the Court concludes that, at this pleading stage, Plaintiffs have alleged Article III standing because they have sufficiently alleged redressability and injury-in-fact. The elements of standing, however, "are not mere pleading requirements but rather an indispensable part of the plaintiff's case." *Lujan*, 504 U.S. at 561. Accordingly, Plaintiffs must support each element of standing "in the same way as any other matter on which [they bear] the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* At the pleading stage, Plaintiffs' general factual allegations of injury resulting from the newly

amended voter laws suffice because the Court assumes the truth of those allegations. *Id.* At later stages of this case, however, Plaintiffs can no longer rest on mere allegations. For example, if the Secretary challenges Plaintiffs' standing on summary judgment, Plaintiffs must adequately support their factual assertions of standing. *See* Fed. R. Civ. P. 56(c) (discussing procedure for supporting factual position). Because the Court is only addressing Plaintiffs' initial standing to bring this action, its decision on that issue is, of course, not a comment on the merits of Plaintiffs' claims.

**B.     Ripeness**

In addition to challenging Plaintiffs' Article III standing, the Secretary also argues the case is not ripe because the challenged laws are not yet in effect.[7] The Supreme Court, however, has held that "where the enforcement of a statute is certain, a pre-enforcement constitutional challenge will not be rejected on ripeness grounds." *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1164 (11th Cir. 2008) (citing *Blanchette v. Connecticut Gen. Ins. Corp.*, 419 U.S. 102, 143 (1974)). In the *Reg'l Rail Reorganization Act Cases*, the plaintiffs challenged the constitutionality of the Regional Rail Reorganization Act of 1973, alleging it worked an unconstitutional "taking" of property without due process. 419 U.S. at 118. The district court concluded the issue was not ripe for adjudication because the statutory scheme required several decisional steps before the final conveyance, and it cited three possible contingencies, one of which was resolved before the case reached the Supreme Court. *Id.* at 139-40. The Supreme Court, however, found the constitutional issue was ripe despite the two remaining alleged contingencies, and it ruled the Act's implementation would "inexorably" lead to the final conveyance, although the exact date of that conveyance could not be presently determined. *Id.* at 140. Because the "inevitability of the operation of Rail Act against certain individuals [was] patent," the Court concluded that the allegedly unconstitutional conveyance was "in no way hypothetical or speculative." *Id.* at 143.

---

[7]     In support of his ripeness challenge, the Secretary also argues "Plaintiffs offer nothing but speculation as to whether anyone will be harmed." (Dkt. 36 at p. 10). This argument, however, is a reprisal of the Secretary's injury-in-fact argument, which the Court rejects. *See, e.g.*, *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (ruling plaintiff does not have to await consummation of threatened injury to obtain preventive relief.); *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1143 (9th Cir. 2010) (ruling future credible threat of harm constitutes injury-in-fact); *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008) (ruling anticipated diversion of resources to address future election laws satisfied "immediacy and likelihood requirements" of standing).

MEMORANDUM DECISION AND ORDER - 15

Similarly, in this case, the alleged injury is not "hypothetical or speculative," because "the inevitability of the operation of [the challenged laws] against certain individuals is patent." *Id.* The operation of the two challenged laws against certain individuals seeking to register to vote or to vote at the polls using a student identification card is certain. Even if some of these would-be voters would be able to obtain a free identification card before the next election, the challenged laws will likely discourage them from voting given that "voting is a low-reward activity for any given individual." *Frank v. Walker*, 773 F.3d 783, 792 (7th Cir. 2014) (Posner, J., dissenting from denial of rehearing en banc). "When the rewards for an activity are low, even a modest cost of engaging in it is a potent discourager." *Id.* The net effect is the average cost of registering each new voter and "getting out the vote" increases, "and because plaintiffs cannot bring to bear limitless resources, their noneconomic goals will suffer." *Browning*, 522 F.3d at 1166. Such allegedly unconstitutional harms are neither speculative nor hypothetical.

Whether framed as an issue of standing or ripeness, the alleged injury here is sufficiently concrete, particularized, actual, and imminent, making Plaintiffs' claims ripe for review. *See, e.g.*, *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1173 (9th Cir. 2022) (holding the constitutional component of ripeness is synonymous with the injury-in-fact prong of the standing inquiry). Because Plaintiffs have sufficiently alleged standing at this stage of the proceedings and the case is ripe for adjudication, the Court will deny the Secretary's request to dismiss Plaintiffs' claims for lack of jurisdiction.

## ORDER

**IT IS ORDERED that** Defendant's Motion to Dismiss (Dkt. 29) is DENIED.

DATED: October 11, 2023

Amanda K. Brailsford
U.S. District Court Judge