UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MARCH FOR OUR LIVES IDAHO and IDAHO ALLIANCE FOR RETIRED AMERICANS,<br><br>        Plaintiffs,<br><br>v.<br><br>PHIL MCGRANE, in his official capacity as the Idaho Secretary of State,<br><br>        Defendant. | Case No. 1:23-cv-00107-AKB<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court is the Motion for Summary Judgment of Defendant Phil McGrane, the Idaho Secretary of State (Secretary) (Dkt. 54), and the Motion for Partial Summary Judgment of Plaintiffs March for Our Lives Idaho (MFOL) and the Idaho Alliance for Retired Americans (Alliance) (Dkt. 55). The Court heard oral argument on May 8, 2024, and took the matter under advisement. Thereafter, the parties submitted supplemental briefing to address standing under the Supreme Court's recent decision in *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024). For the reasons explained below, the Court grants the Secretary's summary judgment motion and denies Plaintiffs' motion for partial summary judgment.

## BACKGROUND

### A.     MFOL and Alliance

MFOL is a student-led organization that, according to Plaintiffs' allegations, "harnesses the power of young people to fight for common sense solutions to end gun violence in Idaho."

(Dkt 20 at ¶ 11). The organization "is led by a board of six young activists, and its constituents include hundreds of supporters and volunteers registered with the organization who have pledged to take action to end gun violence and who benefit from, share in, and help guide the organization's priorities and activities." (*Id.*). MFOL organizes "advocacy campaigns" and "events, rallies, protests, and trainings"; "its board of members and volunteers testify [before] the state legislature to advocate for laws and policies to end gun violence"; and it "conducts voter registration and voter turnout activities, targeting its efforts on young voters." (*Id.*).

The Alliance, according to Plaintiffs' allegations, is a nonprofit organization with a mission of protecting retirees' civil rights and ensuring they obtain "social and economic justice." (*Id.* at ¶ 13). It has 11,407 members, including retirees "from public and private sector unions, community organizations, and individual activists." (*Id.*). "The Alliance and its individual members spend resources on voter registration, get-out-the-vote activities, and other voter engagement and education activities directed at its members and other elderly Idahoans." (*Id.* at ¶ 15). They also "spend resources on recruiting new members, opening new chapters, making presentations to members, and promoting substantive policy campaigns in areas such as retirement income security, pension protections, social security, Medicare, Medicaid, and services for older Idahoans." (*Id.*). Many of the Alliance's members are elderly, no longer drive, and do not need or wish to renew their driver's licenses. (*Id.* at ¶ 14). Some members are new to Idaho and have not yet registered to vote in Idaho. (*Id.*). Others anticipate needing to re-register because they have moved to a new address or have not voted in the last four years. (*Id.*).

## B.    House Bill 340 - Voter Registration

Plaintiffs filed this action against the Secretary, challenging the constitutionality of recent amendments to Idaho voter laws—specifically those amendments passed under House Bill 124 and House Bill 340. House Bill 340 amended Idaho Code § 34-411—Idaho's voter registration

law—to require individuals registering to vote (registrants) to prove their identity by using certain statutorily approved personal identification. The forms of approved identification under § 34-411 now include: (1) an Idaho driver's license or identification card; (2) a United States passport or identification card; (3) a tribal identification card; or (4) an Idaho license to carry a concealed weapon. I.C. § 34-411(3)(a)-(d) (effective July 1, 2023).

The amendment under House Bill 340 eliminated student identification cards to prove identity for purposes of registering to vote. House Bill 340's Statement of Purpose explains the reason for eliminating student identification as an acceptable form of identification. That Statement provides, in relevant part:

> The purpose of this legislation is to clarify and create uniformity in voter registration requirements . . . . Given the lack of uniformity in the sophistication of student ID cards, such cards are no longer a valid form of personal identification to vote at the polls. As an alternative, this legislation requires the Idaho Department of Transportation ("ITD") to issue no-fee identification cards for the purpose of complying with voter registration and voting requirements.

H.B. 340, 67th Leg., Reg. Sess. (Idaho 2023), Statement of Purpose.[1]

Idaho Code § 49-2444 provides for the "no-fee identification cards" referenced in House Bill 340's Statement of Purpose. Currently, section 49-2444 provides, in relevant part, that ITD "shall issue a four (4) year no-fee identification card to any individual eighteen (18) years of age or older who indicates on the application that an identification card is needed to comply with voter registrations or voting requirements." I.C. § 49-2444(22). At the time the parties moved for summary judgment, section 49-2444 limited the issuance of no-fee identification cards to individuals "who [had] not possessed a current driver's license in the preceding six (6) months."

---

[1]     The Secretary confirmed the purpose of House Bill 340 is to realign the registration requirements for photo identification and residency documentation to bring greater uniformity to voter registration and ensure election integrity. (Dkt. 54-3 at p. 16, McGrane Decl. ¶ 2).

MEMORANDUM DECISION AND ORDER - 3

2023 IDAHO H.B. 340 § 8. Effective July 1, 2024, however, the Idaho Legislature has amended § 49-2444(22), to remove this limitation. 2024 IDAHO H.B. 532 § 1.

## C.   House Bill 124 - Polling Identification

House Bill 124 amended Idaho Code § 34-1113 to require voters to provide statutorily approved personal identification to vote at the polls. The forms of approved identification for purposes of voting at the polls is the same as those under the newly amended voter registration law, section 34-411, and include: (1) an Idaho driver's license or identification card; (2) a United States passport or identification card; (3) a tribal identification card; or (4) an Idaho license to carry a concealed weapon. This amendment eliminated the use of student identification cards to prove identity for purposes of voting at the polls. I.C. § 34-1113(1)-(4) (effective Jan. 1, 2024). House Bill 124's Statement of Purpose also explains the reason for eliminating student identification:

> This legislation removes student ID cards from section 34-1113 as an acceptable form of personal identification to vote at the polls. There is a lack of uniformity in the sophistication of student ID cards. Statewide, only 104 voters who voted at the 2022 General Election used a student ID card to vote, which was the second least utilized form of personal identification. Alternative forms of personal identification are available and accepted at the polls.

H.B. 124, 67th Leg., Reg. Sess. (Idaho 2023), Statement of Purpose.

## D.   Procedural Background

MFOL initially filed this action against the Secretary in March 2023, immediately following the passage of House Bill 124.  (Dkt. 1). Then in April 2023, when House Bill 340 passed, the Alliance joined this case as a plaintiff, and Plaintiffs amended their complaint to allege House Bill 340 also violates the U.S. Constitution.  (Dkt. 20). Plaintiffs claim the amendments in House Bill 124 and House Bill 340 "make it dramatically harder for many eligible Idaho citizens to register and vote, by sharply restricting the forms of identification that may be used." (Dkt. 57

at p. 7). They argue the amendments specifically target MFOL's young voters and the Alliance's "old voters." (*Id.*).

In their Amended Complaint, Plaintiffs allege three claims for relief under 42 U.S.C. § 1983. They allege House Bill 124 and House Bill 340 both violate the Twenty-Sixth Amendment. Further, they allege House Bill 340 violates the Twenty-Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs seek declaratory relief that the amendments are unconstitutional and an injunction enjoining their enforcement. The Secretary defends the amended laws as a constitutional requirement imposed to prevent in-person voter fraud, to increase voter confidence and turnout, and to streamline voter registration and voting.

In response to Plaintiffs' amended complaint, the Secretary filed a motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction. The Court denied that motion, finding that Plaintiffs had adequately alleged both organizational and associational standing. (Dkt. 47). The Secretary now moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, renewing the challenge to Plaintiffs' standing and otherwise seeking summary judgment on Plaintiffs' claims. (Dkt. 54). Plaintiffs filed a cross-motion for partial summary judgment, arguing House Bill 340 violates the Twenty-Fourth and Fourteenth Amendments. (Dkt. 55).

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). In

considering a motion for summary judgment, the court must "view[ ] the facts in the non-moving party's favor." *Id.* To defeat a motion for summary judgment, the respondent need only present evidence on which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in the respondent's favor." *Id.* (citation omitted).

The trial court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather, the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that precludes summary judgment. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

Where parties file cross-motions for summary judgment on the same issue, the court must consider both motions and all evidence submitted by both parties. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). Each motion must be considered on its own merits. *Id.* Even if both parties assert no genuine disputes of material fact exist, the court must still review the record and determine disputes of material fact exist. *Id.*

While general factual allegations of injury will suffice for standing at the pleading stage, at the summary judgment stage, the "plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts' [] which for purposes of the summary judgment motion will be taken to be true." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (citing F.R.C.P. 56(e)).

## ANALYSIS

### A.      Article III Standing

The Secretary urges the Court to revisit its earlier conclusion that Plaintiffs have Article III standing. An organization may assert standing either on behalf of its members, which is referred to as associational standing, or directly on its own behalf, which is referred to as organizational standing. *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 662 (9th Cir. 2021) ("*EBSC II*") ("Organizations can assert standing on behalf of their own members, or in their own right."); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 583 (1992) .   To determine whether an organization meets the constitutional minimum requirements for standing, courts conduct the same three-fold inquiry for determining an individual's standing. *Lujan*, 504 U.S. at 560. To have standing, Plaintiffs must establish that: (1) "they have suffered an injury in fact"; (2) "their injury is fairly traceable to a defendant's conduct"; and (3) "their injury would likely be redressed by a favorable decision." *Mecinas v. Hobbs*, 30 F.4th 890, 896-97 (9th Cir. 2022).

In its Memorandum Decision and Order issued on October 11, 2023, the Court concluded, based on a facial review of the Amended Complaint, that MFOL "had adequately alleged a diversion-of-resources injury to establish organizational standing." (Dkt. 47 at p. 9). The Court similarly concluded the Alliance's allegations satisfied organizational standing at the motion to dismiss stage of the proceedings. (*Id.* at p. 10). The declaration Plaintiffs submit on summary judgment appear to support this conclusion. (Dkt. 55-3 at pp. 8-13). For purposes of resolving the Secretary's summary judgment motion, the Court construes the facts in the declaration as true. *Lujan*, 504 U.S. at 561 (citing F.R.C.P. 56(e)).

"Article III allows an organization to sue in its own right if it can allege a sufficient 'personal stake in the outcome of the controversy.'" *Nielsen v. Thornell*, 101 F.4th 1164, 1169 (9th Cir. 2024), *as amended* (July 8, 2024) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363,

378-79 (1982)). The Ninth Circuit has recognized an organization has "direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose." *Id.* (quoting *EBSC II*, 993 F.3d at 663). "But this frustration must amount to a 'concrete and demonstrable injury to the organization's activities,' not 'simply a setback to its abstract social interests.'" *Id.* (quoting *Havens Realty*, 455 U.S. at 379).

Although the Ninth Circuit "often has not explained in detail what types of organizational activities in response to a defendant's action constitute an Article III injury under *Havens Realty*," it recently reiterated "an organization may not manufacture an injury by choosing to spend money fixing a problem that otherwise would not affect the organization at all." *Nielsen*, 101 F.4th at 1170 n.2 (quoting *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664, 682 (9th Cir. 2023) (en banc)). In other words, "an organization's mere desire to act (and in the process spend resources) to oppose a policy cannot confer standing to challenge that policy." *Id.*

On the other hand, the Ninth Circuit has found direct standing under a "diversion-of-resources" theory when the organization shows both that the defendant's challenged conduct has caused a drain on its resources and that the organization would have used those resources in another way. *See, e.g.*, *Nielsen,* 101 F.4th at 1169-71; *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 879-80 (9th Cir. 2022). For example, in *Sabra*, the Ninth Circuit held the organizational plaintiff had standing because the complaint alleged the plaintiff had to "divert [its] resources to create a campaign correcting the Islamophobic information in [a teacher's] course materials." 44 F.4th at 879. Likewise, in *Nielsen*, the Ninth Circuit found the NAACP had plausibly alleged standing under a diversion-of-resources theory where it alleged it had expended resources

"educating the public about the harms and failures of private-for-profit prisons." *Nielsen,* 101 F.4th at 1170 n.2.

Similarly, in this case, Lucina Glynn, a co-director of MFOL, attested in her declaration that "House Bill 340 makes it harder for its constituents to register and vote and harder for [MFOL] to successfully register and turn them out to vote." (Dkt. 55-3 at p. 11, Glynn Decl. ¶ 10). According to Ms. Glynn:

> MFOL . . . had to divert and will continue to have to divert a significant amount of resources . . . to create new voter education materials to educate [MFOL's] constituents about the new voter registration requirements, reach out to [motor vehicle] offices for guidance on obtaining a no-fee identification, re-train its volunteers on the effects of House Bill 340 on voter registration requirements, and help its constituents obtain acceptable House Bill 340 acceptable identification.

(*Id.* at p. 13, Glynn Decl. ¶ 17). Because of this diversion of resources to these activities, Ms. Glynn testified, MFOL "has less resources to support other activities central to its mission" (*id.*), such as "advocating for and educating its constituents on common-sense gun reform policies, organizing rallies and protests against gun violence, and holding vigils to honor those impacted by gun violence." (*Id.* ¶ 16).

Based on Glynn's declaration, MFOL has shown sufficient injury—primarily in the form diverting time, talent, and resources to educate their voters and implementing stricter registration requirements—to establish organizational standing. *Nielsen,* 101 F.4th at 1169-81; *Sabra,* 44 F.4th at 887-90; *see also Lee v. Virginia State Bd. of Elections*, 188 F. Supp. 3d 577, 584 (E.D. Va.), *aff'd,* 843 F.3d 592 (4th Cir. 2016) (citing *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007)). As the Ninth Circuit has explained, organizational standing requires only a minimal showing of injury. *Crawford*, 472 F.3d at 951. A concrete, redressable harm "amounting to pennies" is sufficient. *EBSC II*, 993 F.3d at 664; *see also E. Bay Sanctuary Covenant v. Trump*,

932 F.3d 742, 765 (9th Cir. 2018) ("*EBSC I*"). Here, MFOL has cleared that bar—even if just barely—and has organizational standing.

The Court reaches this conclusion despite the Supreme Court's recent decision in *Alliance for Hippocratic Med.*, 602 U.S. at 393-95, in which the Court clarified that *Havens Realty's* "unusual" facts did not support a categorical rule allowing standing whenever "an organization diverts its resources in response to a defendant's actions," particularly when the injury to the organization is not direct and the organization is solely an issue-advocacy organization. *All. for Hippocratic Med.*, 602 U.S. at 395. In *Alliance for Hippocratic Medicine*, individual physicians and medical associations with moral objections to abortion sued the FDA over regulations relaxing the requirements for prescribing and obtaining mifepristone, a drug used in the early termination of pregnancies. *Id.* at 372-77. The plaintiffs were not themselves affected by the challenged regulations; i.e., they did not prescribe or use mifepristone, did not have to treat patients who took mifepristone, and were not otherwise directly regulated by mifepristone's approval. *Id.* at 386-90. Rather, their assertions of injury relied entirely on the costs they incurred to challenge the FDA's regulations and to advocate against mifepristone's use. *Id.* at 390.

In concluding that these medical associations lacked organizational standing to challenge the FDA regulations, *Alliance for Hippocratic Medicine* explained a plaintiff "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* Instead, the organization must also show the defendant's conduct "perceptibly impair[s]" or interferes with the organization's core activities beyond mere issue advocacy. *Id.* at 395. As the Supreme Court explained, the organization in *Havens Realty* did more than engage in issue advocacy; it "also operated a housing counseling service," and the defendant's

actions in *Havens Realty* "interfered with [the plaintiff organization's] core business activities." *All. For Hippocratic Medicine*, 602 U.S. at 395.

In this case, too, MFOL is more than an issue-advocacy organization seeking to challenge and advocate against the recent amendments to Idaho's voter laws. Instead, MFOL has submitted evidence showing it is in the "business" of educating and registering voters—not merely gathering information and advocating against the law. As for the directness of the harm, *Alliance for Hippocratic Medicine* did not question—and, indeed, approvingly cited—many other cases in which the Court has allowed a plaintiff to sue a defendant even though that defendant's conduct only harmed that plaintiff indirectly. *Id.* at 384 (citing cases). Similarly, in this case, MFOL has presented evidence that Idaho's amended voter laws have increased its costs for its core activities of educating and registering voters.

Moreover, in *Nielsen*—which was amended *after* the Supreme Court issued its decision in *Alliance for Hippocratic Medicine*—the Ninth Circuit discussed and reaffirmed its prior cases finding organizational standing under a *Havens Realty* diversion-of-resource theory. *Nielsen*, 101 F.4th at 1169-81. Indeed, the *Nielsen* panel voted to deny a petition for rehearing, asserting the *Nielsen* majority was "plainly incorrect" under *Alliance for Hippocratic Medicine*. *Nielsen*, 101 F.4th at 1168. As a result, the Ninth Circuit precedent interpreting *Havens Realty* before *Alliance for Hippocratic Medicine* remains binding on this Court.

Alliance's standing is less certain but need not be addressed. Plaintiffs only seek declaratory and injunctive relief; as a result, the law requires that only one plaintiff have standing; and MFOL has that standing. *See Mecinas*, 30 F.4th at 897 ("In a suit with multiple plaintiffs, generally only one plaintiff need have standing for the suit to proceed."); *Crawford*, 472 F.3d at 951 ("Only injunctive relief is sought, and for that only one plaintiff with standing is required.").

**B.     Twenty-Sixth Amendment Claim**

The Secretary moves for summary judgment on Plaintiffs' first claim. In that claim, Plaintiffs allege House Bills 124 and 340 violate the Twenty-Sixth Amendment. (Dkt. 20 at ¶ 78). The Twenty-Sixth Amendment forbids any state from denying or abridging the voting rights of citizens over the age of eighteen "on account of age." U.S. Const. amend. XXVI, § 1. Neither the Supreme Court nor the Ninth Circuit has considered a challenge to an election law under the Twenty-Sixth Amendment. *See, e.g.*, *Tully v. Okeson*, 78 F.4th 377, 382 (7th Cir. 2023) ("*Tully II*") ("The Supreme Court has not addressed the definition of the right to vote in the context of the Twenty-Sixth Amendment."); *see also Texas Democratic Party v. Abbott*, 978 F.3d 168, 183 (5th Cir. 2020) (noting the Twenty-Sixth Amendment "has yet to be interpreted in any significant depth")).

Lacking any binding authorities, the parties dispute the applicable test to determine whether House Bills 124 and 340 violate the Twenty-Sixth Amendment. Plaintiffs argue courts have "repeatedly" held the Supreme Court's decision in *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977), establishes the standard "for assessing purposeful discrimination [and] provides the appropriate framework for adjudicating Twenty-Sixth Amendment claims." (Dkt. 57 at p. 15).

In *Arlington Heights*, the Supreme Court addressed an equal protection challenge under the Fourteenth Amendment to an alleged racially discriminatory rezoning decision. *Id.* at 252-53. The Court ruled that "determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. It identified the "subjects of proper inquiry" to include: (1) "a clear pattern unexplainable on grounds other than race"; (2) the decision's "historical background," including any "official action taken for invidious purposes," "the specific sequence of events leading up to

the challenged decision," and any procedural or substantive departures in reaching the decision; (3) and the legislative history, including any "contemporary statements by members of the decisionmaking body, minutes of the meetings, or reports." *Id.* at 268.

Courts considering voting law challenges have noted the Twenty-Sixth Amendment's language echoes the Fifteenth Amendment's prohibition on race discrimination in voting, which provides voting rights "shall not be denied or abridged . . . on account of race." *See, e.g.*, *Tully II*, 78 F.4th at 384; *see also One Wisconsin Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 926 (W.D. Wis. 2016), *rev'd in part on other grounds sub nom.*, *Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020). Because of these parallels, some courts have concluded *Arlington Heights*' standard provides the appropriate framework for evaluating claims of intentional age discrimination under the Twenty-Sixth Amendment. *See, e.g.*, *League of Women Voters of Florida, Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1221 (N.D. Fla. 2018) (applying *Arlington Heights* with parties' consent); *One Wisconsin*, 198 F. Supp. 3d at 926 (applying *Arlington Heights* and finding no discriminatory intent); *Lee*, 188 F. Supp. 3d at 609 (same), *aff'd*, 843 F.3d 592 (4th Cir. 2016).

To the contrary, however, several courts have noted that "it is far from clear that the Twenty-Sixth Amendment should be read to create a cause of action that imports principles from Fifteenth-Amendment jurisprudence." *Lee*, 843 F.3d at 607; *see also N. Carolina State Conf. of the NAACP v. McCrory*, 182 F. Supp. 3d 320, 523 (M.D.N.C. 2016) (explaining "[i]t is far from clear that the Twenty-Sixth Amendment" is "effectively the Fifteenth Amendment but with young voters as the relevant class"), *rev'd and remanded on other grounds*, 831 F.3d 204 (4th Cir. 2016).

Here, the Secretary rejects *Arlington Heights*' analytical framework as the applicable standard for analyzing whether House Bills 124 and 340 violate the Twenty-Sixth Amendment. Rather, the Secretary argues the Court should rely on more recent case law addressing whether

voting laws abridge voting rights under the Twenty-Sixth Amendment. For example, the Secretary relies on *Tully v. Okesen*, 977 F.3d 608, 613 (7th Cir. 2020) ("*Tully I*") (affirming denial of preliminary injunction to allow unlimited absentee voting during pandemic), and *Nashville Student Org. Comm. v. Hargett*, 155 F. Supp. 3d 749, 758 (M.D. Tenn. 2015) (dismissing challenge under Fourteenth and Twenty-Sixth Amendments to law excluding student identification as acceptable form of photo identification for voting).

The Court agrees that case law addressing whether a law abridges the right to vote provides the more appropriate framework for analyzing whether House Bills 124 and 340 abridge voting rights in violation of the Twenty-Sixth Amendment. For example, the Seventh Circuit in *Tully II* addressed whether an Indiana law violated the Twenty-Sixth Amendment by allowing voters, who were 65 years and older, to vote by mail, thereby abridging the rights of younger voters, who did not qualify for absentee voting. 78 F.4th at 378. "To determine the contours of that right," the Seventh Circuit began its analysis by looking "first at the language of the Amendment and the way that language was understood at the time the Twenty-Sixth Amendment was adopted." *Id.* at 383. The Seventh Circuit then proceeded to examine various Supreme Court cases discussing the meaning of "the right to vote" and the term "abridge." *Id.* at 383-86 (discussing, among other cases, *McDonald v. Bd. of Election of Comm'rs of Chicago*, 394 U.S. 802, 807 (1969); *Lane v. Wilson*, 307 U.S. 268 (1939); *South Carolina v. Katzenbach*, 383 U.S. 301 (1966); *Harman v. Forssenius*, 380 U.S. 528 (1965)).

In conducting this analysis, the Seventh Circuit explained the constitutional "right to vote," as discussed in the Supreme Court's decisions in *McDonald*, *Lane*, and *Katzenbach*, encompasses the right to the "effective exercise of the franchise," including "the right to register, the right to cast a ballot, and the right to have that ballot counted." *Tully II*, 78 F.4th at 383-85. The Seventh

Circuit rejected the plaintiff's contention that every age-based distinction in voting procedures constitutes an "abridgement" of the right to vote within the meaning of the Twenty-Sixth Amendment, and it held that "an abridgement must involve the imposition of a material requirement" on the right to vote. *Id.* at 386 (internal quotation marks omitted) (quoting *Harman v. Forssenius*, 380 U.S. 528, 541 (1965)).

Finally, relying on *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320 (2000), the Seventh Circuit in *Tully II* clarified that "abridge" must mean something more than "retrogression" as that term is used in § 5 of the Voting Rights Act:

> *Whether [the challenged law] has a retrogressive effect, i.e., whether it renders the Plaintiffs "worse off," is not the equivalent of asking whether their right to vote has been abridged.* Focusing just on retrogression for purposes of the Fifteenth Amendment would preclude relief to individuals who, even before the passing of the act in question, had not enjoyed fully the right to vote. As the Court in *Bossier Parish* explained, in order to determine whether the Fifteenth Amendment has been violated, the question is whether the right to vote—as it was intended to be exercised—has been abridged. *Bossier Parish* therefore sets the starting point for determining whether an "abridgement" has occurred as that term was used in *Harman. That starting point is the right to vote, which may or may not be secured by the status quo of state law.*

*Tully II*, 78 F.4th at 387 (emphasis added).

Applying this understanding of "abridgement" and "right to vote," the Seventh Circuit in *Tully II* concluded the challenged law limiting absentee voting to elderly voters did not abridge the rights of younger voters and found the law imposed "no requirements, much less *material* requirements, on the exercise of the franchise through this accommodation of the elderly." *Id.* As the Seventh Circuit explained, "Indiana provides myriad ways for registered voters to exercise their right to vote," offering "full protections of the right to vote for all registered voters." *Id.*

Similarly, in this case, eliminating the use of student identification cards on *all* voters imposes no "material requirement" on younger voters solely on account of age. House Bill 340

requires everyone to present some form of acceptable identification to register to vote or to vote. Students, like all other voters, may choose among an Idaho driver license, a United States passport or identification card, a tribal identification card, a concealed weapon permit, or a no-fee identification card. While it may be easier for students to register to vote or to vote using their student identification card, "it does not automatically follow" that not allowing them to use these cards imposes a "material requirement" on their right to vote on account of their age. *See Nashville Student Org. Comm.*, 155 F. Supp. 3d at 757. Consequently, House Bills 124 and 340 do not abridge voters' rights as the term abridgment is understood in the Supreme Court's case law.

Regardless, even if the Court were to apply the *Arlington Heights* analytical framework, as Plaintiffs urge, the Court's conclusion remains the same. In *Arlington Heights*, the Supreme Court explained that "official action will not be held unconstitutional solely because it results in a [] disproportionate impact." 429 U.S. at 264-65. Instead, to establish a constitutional violation, a plaintiff must show the governing body had a discriminatory intent or purpose, which was a "motivating factor" in its decision. *Id*. at 265-66. Discriminatory intent or purpose "implies more than intent as volition or intent as awareness of consequences. It implies that the decision maker [in this case a state legislature], selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) (citations and footnote omitted).

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. To guide this inquiry, courts look to a non-exhaustive list of factors from *Arlington Heights*: its relative impact on the class of voters; the historical background of a challenged decision; specific antecedent events, departures from normal procedures; and

contemporary statements of decisionmakers. *Id.* at 266-68; *see also Bossier Par. Sch. Bd.*, 528 U.S. at 343 (Souter, Stevens, Ginsburg, Breyer, JJ concurring). If "[age] discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985).

Considering these factors, the Court finds the legislature neither enacted House Bill 340 nor House Bill 124 with an age-based discriminatory purpose. While Plaintiffs present some evidence that the elimination of student identification cards as an acceptable form of identification bears more heavily on younger voters, such disparate impact is minimized by the fact that elimination of student identification cards will not likely result in an inequality of opportunity to vote for younger citizens. *McCrory*, 997 F. Supp. 2d at 355-56 (explaining "the disparate impact is softened by the fact that elimination of [same-day registration] will not likely result in an inequality of opportunity to vote for black citizens") (citing *Brown v. Detzner*, 895 F. Supp. 2d 1236, 1246 (M.D. Fla. 2012) ("Because . . . the evidence before the Court does not demonstrate that the changes will deny minorities equal access to the polls, the otherwise disproportionate effect of the amendments does not weigh heavily in favor of finding discriminatory purpose.").

As for the other factors, Plaintiffs present evidence that the Secretary requested information regarding age-based voting patterns with respect to use of the affidavit for voting and that some other legislators expressed "concerns" about the use of student identification cards. Plaintiffs, however, present no evidence the "concerns" expressed related to the age of the voters. By contrast, the Legislature offered legitimate reasons for excluding student identification cards due to the "lack of uniformity in the sophistication of student ID cards." H.B. 124, 67th Leg., Reg. Sess. (Idaho 2023), Statement of Purpose. These reasons include that standards at Idaho high schools

and universities for obtaining student identification cards vary widely, including that some high schools even allow students to use preferred names or nicknames on their student identification cards rather than their legal name. Additionally, the evidence does not support Plaintiffs' claims of significant procedural irregularities in the passage of the bills; instead, Plaintiffs cite evidence of the usual "sausage-making" in the legislative process. In sum, neither House Bill 124 nor House Bill 340 impose a "material requirement" on younger voters, and the evidence fails to suggest the Legislature enacted the bills with the intent to discriminate against young voters. Accordingly, the Court grants the Secretary summary judgment on Plaintiffs' claim under the Twenty-Sixth Amendment.

## C.  Unconstitutional Poll Tax

The Secretary and Plaintiffs both move for summary judgment on Plaintiffs' Second Claim for Relief. In that claim, Plaintiffs alleges House Bill 340 imposes an unconstitutional poll tax in violation of the Twenty-Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment "by requiring some voters to pay a fee for a state- or federal-issued identification card to register to vote." (Dkt. 20 at ¶ 85). The Fourteenth Amendment protects voters' rights to vote in state elections. *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 666 (1966). Meanwhile, the Twenty-Fourth Amendment protects voters' rights in federal elections and provides a citizen's right to a vote for President, Vice President, or a member of Congress "shall not be denied or abridged . . . by reason of failure to pay any poll tax or other tax." U.S. Const. amend. XXIV, § 1. Congress passed the Twenty-Fourth Amendment "to combat the 'disenfranchisement of the poor,' which was the intention of the early poll taxes." *Gonzalez v. Arizona*, 485 F.3d 1041, 1049 (9th Cir. 2007) ("*Gonzalez I*") (quoting *Harman*, 380 U.S. at 539).

The Supreme Court in *Harman* addressed whether a Virginia statute, which required voters either to pay a $1.50 poll tax or alternatively to file a certificate of residency, violated the Twenty-

Fourth Amendment. *Harman*, 380 U.S. at 530-31. Because the $1.50 fee was undisputedly a poll tax, the Court addressed whether Virginia could require voters to file a certificate of residency if they refused to or could not pay a poll tax. *Id.* at 542. Explaining a state could not "impose a penalty upon those who exercise a right guaranteed by the Constitution," *id.* at 540, the Court determined the certificate of residency requirement, as an alternative to paying the poll tax, "unquestionably" created a "real obstacle" to voting "for those who assert their constitutional exemption from the poll tax." *Id.* at 541.  Because the Virginia law imposed "a material requirement" solely on those voters who refused to surrender their constitutional right to vote unless paying a poll tax, the Court held the certificate of residency requirement constituted an abridgement of the right to vote. *Id.* at 542.

In *Harper*, the Supreme Court held that Virginia's state law levying an annual $1.50 poll tax on voters violated the Equal Protection Clause of the Fourteenth Amendment. 383 U.S. at 664-66. It concluded "the interest of the State, when it comes to voting, is limited to the power to fix qualifications." *Id.* at 668. Further, it concluded that Virginia's poll tax made affluence an electoral standard but that "[w]ealth, like race, creed, or color, is not germane to one's ability to participate intelligently in the electoral process." *Id.* Accordingly, the Court held the poll tax was invidiously discriminatory, and a per se violation of the Equal Protection Clause. *Id.* at 666-67.

Relying on *Harman* and *Harper*, Plaintiffs argue that, because House Bill 340 requires an individual to use an approved form of identification (i.e., an Idaho driver's license or identification card, a United States passport or identification card, a tribal identification card, or a concealed weapon permit), it imposes an unconstitutional poll tax in violation of the Twenty-Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment. The Ninth Circuit,

however, rejected a similar argument in *Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012) ("*Gonzalez II*").

At issue in *Gonzalez II* was the constitutionality of Arizona's "Proposition 200," which required voters to show identification at the polling place (the "polling place provision"). *Id.* at 388. The plaintiffs in that case argued that "because some voters [did] not possess the identification required under Proposition 200, those voters [would] be required to spend money to obtain the requisite documentation" and that the payment for identification was "indirectly equivalent to a tax on the right to vote." *Id.* at 407. The Ninth Circuit rejected this argument, concluding that Proposition 200's polling provision neither violated the Fourteenth Amendment nor the Twenty-Fourth Amendment. *Id.* at 408-09.

Considering the plaintiffs' Twenty-Fourth Amendment argument, the Ninth Circuit in *Gonzalez II* concluded that the polling provision did not "place a material burden on the voter 'solely because of his refusal to waive his constitutional immunity' to a poll tax" as in *Harman*; rather, the polling provision required "all voters" to present identification at the polls; and as a result, "[r]equiring voters to show identification at the polls does not constitute a tax." *Id.* at 408. Likewise, the Ninth Circuit concluded the polling provision did not violate the Fourth Amendment's Equal Protection Clause. *Id.* In reaching this conclusion, the Ninth Circuit reasoned that the polling provision fell "outside of *Harper*'s rule that restrictions on the right to vote are invidious if they are unrelated to voter qualifications"; "[r]equiring voters to provide documents proving their identity is not an invidious classification based on impermissible standards of wealth or affluence, *even if some individuals have to pay to obtain the documents*"; and requiring voters to prove their identity "falls squarely within the state's power to fix core voter qualifications." *Id.* at 409.

*Gonzalez II* compels the same conclusion here, i.e., House Bill 340 does not violate either the Fourteenth Amendment or the Twenty-Fourth Amendment. House Bill 340's requirement that a voter show approved identification does not place a material burden on a voter solely because he refused to waive his constitutional immunity to a poll tax; the requirement applies to all voters; and it directly relates to voter qualification.

Plaintiffs nonetheless attempt to distinguish *Gonzalez II,* noting Proposition 200's polling provision allowed voters to use any type of photo identification or two forms of identification bearing the voter's name and address, such as a utility bill or bank statement. They argue that, in contrast, House Bill 340 requires some new registrants, who are not eligible for no-fee identification, to pay the government to obtain approved identification. The Ninth Circuit, however, made no such distinction in *Gonzalez II.* Under *Gonzalez II*, if the identification requirement applies to all voters and not just those who refuse to pay a government fee, then the cost relates to voters' qualifications and is not an unconstitutional poll tax under either the Twenty-Fourth Amendment or the Equal Protection Clause. *Id.* at 408-10. Because House Bill 340 applies to all new registrants and relates to voter qualification, *Gonzalez II* controls.

Plaintiffs' reliance on *Crawford* is also misplaced. The Supreme Court in *Crawford* did not address whether the law at issue imposed a poll tax.  Regardless, to the extent the Court considered the standard articulated in *Harper*, it "confirmed the general rule that evenhanded restrictions that protect the integrity and reliability of the electoral process itself are not invidious and satisfy the standard set forth in *Harper*." *Crawford v. Marion Cnty. Elec. Bd.*, 553 U.S. 181, 189-90 (2008) (internal quotation marks omitted) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 n.9 (1983)). Here, Idaho has enacted evenhanded restrictions that apply to all registrants to protect the

integrity and reliability of the electoral process itself. Such restrictions satisfy the standard in *Harper*.

This conclusion is not changed by Justice Stevens' statement in the plurality opinion in *Crawford* (with whom Chief Justice Roberts and Justice Kennedy joined) that a voting regulation would not pass muster under *Harper* "if the State *required* voters to pay a tax or a fee to obtain a *new* photo identification." *Crawford*, 553 U.S. at 198 (emphasis added). First, House Bill 340 does not *require* voters to obtain *new* photo identification. Second, this statement was "uttered in passing"; was "made . . . without analysis"; and provides little instructive guidance on the issue. *C.f. United States v. Johnson*, 256 F.3d 895, 915 (9th Cir. 2001) (separate opinion of Kozinski, J., Trott, T.G. Nelson, Silverman, JJ.) (noting statements "uttered in passing" and "made . . . without analysis" do not bind future panels). Third, Justice Stevens' statement is not controlling law because the three concurring Justices rejected the notion of measuring the burden on a subset of voters: "what petitioners view as the law's several light and heavy burdens are no more than the different impacts of the single burden that the law uniformly imposes on all voters." *Crawford*, 553 U.S. at 205 (Scalia, J., concurring in judgment); *see also Marks v. United States*, 430 U.S. 188, 193-94 (1977).

Moreover, Idaho law now provides all registrants qualify for no-fee identification. The Idaho Legislature amended § 49-2444, which provides for a no-fee identification, effective July 2024, to remove the requirement that a person must not possess a driver's license for six months before applying for a no-fee identification. This amendment effectively eliminates Plaintiffs' argument that some registrants will have to pay a fee to obtain acceptable identification. Specifically, "voters with an active driver's license that expires within six months before an election but who no longer drive and would otherwise not renew their driver's licenses" and

"voters who move to Idaho shortly before election day and have not yet surrendered their still-valid out-of-state driver's license in exchange for an Idaho driver's license" (Dkt. 55-1 at p. 19) are now eligible for no-fee identification. Thus, even these registrants will not have to pay a government fee for identification.

The only remaining registrants who may not be able to use no-fee identification to register and to vote are individuals who will turn eighteen shortly before election day and may not have time to obtain no-fee identification after turning eighteen but before election day. The Secretary, however, has submitted evidence that an individual—who has applied for but not yet received no-fee identification—will receive a receipt that may be used as a valid form of identification until receipt of the no-fee identification. (Dkt. 54-3 at pp. 90-95).

Further, the Court rejects the notion that House Bill 340 is an unconstitutional poll tax because some sliver of prospective voters may have to pay a government fee to obtain identification to register to vote. "A facial challenge must fail where the statute has a plainly legitimate sweep." *Crawford*, 553 U.S. at 202 (internal quotation marks and citations omitted) (plurality opinion); *see also id.* at 206 (Scalia, J., concurring in judgment) (rejecting view that individual impacts of generally applicable photo-identification law are relevant to determining severity of burden imposed). "When evaluating a neutral, nondiscriminatory regulation of voting procedure, we must keep in mind that a ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *Id.* at 203 (internal quotation marks and brackets omitted). In this case, Plaintiffs fail to demonstrate that "the proper remedy—even assuming an unjustified burden on some voters—would be to invalidate the entire statute." *Id.*

Finally, Plaintiffs fail to submit any evidence that even a single voter has had to pay a government fee to obtain new identification to register to vote. *Id.* at 200 ("But on the basis of the

evidence in the record it is not possible to quantify either the magnitude of the burden on this narrow class of voters or the portion of the burden imposed on them that is fully justified."). To the contrary, the evidence in the record indicates even an individual who turns eighteen shortly before election day may obtain a free receipt for no-fee identification—which the Secretary states "is an acceptable form of identification for registering to vote and voting, even if it [is] on election day." (Dkt. 56-1 at pp. 7-8 (citing Dkt. 54-3 at p. 94)) ("The new receipt ITD is issuing is a valid form to show proof of identification and proof of residency."). Based on this record, the Court cannot conclude voters have had to pay a government fee to obtain acceptable identification to register to vote. House Bill 340 is, therefore, not an unconstitutional poll tax. Accordingly, the Court grants the Secretary's summary judgment on Plaintiffs' Second Claim for Relief and denies Plaintiffs' partial motion for summary judgment.

**D.     Equal Protection**

Finally, the Secretary moves for summary judgment on Plaintiffs' Third Claim for Relief. That claim alleges House Bill 340 violates the Equal Protection Clause of the Fourteenth Amendment "by discriminating against new registrants as compared with existing voters." (Dkt. 20 at ¶ 88).   Specifically, they allege "new registrants must show one of four forms of identification to register to vote, with no exceptions," while "existing registrants do not need to show any identification because they can instead sign an affidavit attesting to their name and residency."  (*Id.*). Further, Plaintiffs allege "no legitimate, neutral justification for House Bill 340's differential treatment of new and existing registrants" exists.  (Dkt. 20 at ¶ 94).

The parties agree the *Anderson-Burdick* framework[2] applies to address Plaintiffs' Fourteenth Amendment challenge to House Bill 340. (Dkt. 57 at p. 24). Under this framework, a

---

[2]      *Burdick v. Takushi*, 504 U.S. 428 (1992); *Anderson v. Celebrezze*, 460 U.S. 780 (1992).

court identifies the character and magnitude of the alleged injury to the right which the Fourteenth Amendment protects and then weighs that injury against the precise interests the State offers as justification for the burdened imposed. *Nelson v. Warner*, 12 F.4th 376, 387 (9th Cir. 2021); *Mecinas*, 30 F.4th at 902. Under this framework, a court identifies the character and magnitude of the alleged injury to the right the Fourteenth Amendment protects and then weighs that injury against the precise interests the State offers as justification for the burdened imposed. *Mecinas*, 30 F.4th at 902.

The *Anderson-Burdick* framework "prescribes a sliding-scale level of scrutiny for evaluating governmental actions that burden the right to vote." *Tedards v. Ducey*, 951 F.3d 1041, 1066 (9th Cir. 2020). At one end of the spectrum, strict scrutiny applies, i.e., "severe restrictions must be narrowly drawn to advance a state interest of compelling importance." *Id.* (quotation omitted). "At the other end of the spectrum, important state regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." *Id.* (quotations and brackets omitted). "Thus, the burdening of the right to vote always triggers a higher level of scrutiny than rational basis review, but does not always trigger strict scrutiny." *Id.*

An analysis under the *Anderson-Burdick* framework involves a two-step inquiry. First, the court assesses the magnitude of the burden the challenged regulation creates, i.e., "where the burden falls on a minimal-to-severe spectrum." *Mi Familia Vota v. Hobbs*, 608 F. Supp. 3d 827, 841 (D. Ariz. 2022) (citing cases). Second, the court evaluates the State's precise interests justifying the burden. *Id.* The degree of scrutiny applied during this second step depends on the magnitude of the burden determined in the first step. *Id.* "Severe burdens must meet strict scrutiny while non-severe burdens trigger less exacting review." *Id.* at 842 (quotations omitted). Under the

latter test, a challenged regulation, which imposes a non-severe burden, i.e., minimal or slight burden, will be upheld if the regulation advances an important interest. *Id.*

Although the parties agree the *Anderson-Burdick* framework applies to address Plaintiffs' Fourteenth Amendment challenge, they disagree on the magnitude of the burden House Bill 340 imposes. The Secretary argues that requiring an individual registering to vote to show an approved form of identification, which may include no-fee identification, imposes a "very limited burden." (Dkt. 54-1 at p. 22). In response, Plaintiffs argue House Bill 340's identification requirements should be subject to "heightened scrutiny" because "[t]hey create two classes of voters: the previously registered [voter], who may vote without a photo identification by using an affidavit, and the unregistered, who may not vote without obtaining voter identification." [3] (Dkt. 57 at pp. 25-26). Relatedly, Plaintiffs allege that House Bill 340 discriminates "against new registrants as compared to existing voters [because] new registrants must show one of four forms of identification to register to vote, with no exceptions. In contrast, existing [voters] do not need to show any identification, because they can instead sign an affidavit attesting to their name and residency." (Dkt. 20 at ¶ 88).

The Court agrees with the Secretary that House Bill 340's requirement that registrants provide an approved form of identification is  a "non-severe" burden "trigger[ing] less exacting review." *Mi Familia Vota*, 608 F. Supp. 3d at 842 (internal quotation marks omitted). The Supreme

---

[3]     Plaintiffs also assert a third class of persons affected by House Bill 340, arguing "the barrier is especially severe for new registrants who have recently moved from out of state, who do not yet have an Idaho's driver's license and cannot obtain one without passing a test, but who cannot obtain an Idaho [no-fee] identification card without surrendering their still-valid out-of-state license." (Dkt. 57 at p. 26). The Legislature, however, eliminated this class of individuals by removing the limitation on issuing no-fee identification to individuals "who [had] not possessed a current driver's license in the preceding six (6) months." I.C. § 49-2444(22) (effective July 1, 2024).

Court's decision in *Crawford* supports this conclusion. In that case, the Supreme Court upheld the constitutionality of an Indiana law requiring voters to present government-issued photo identification to vote. *Crawford*, 553 U.S. at 185. While noting Indiana provided free photo identification, the Court ruled that the "inconvenience" of making a trip to a state agency, gathering documents, and posing for a photograph "surely [did] not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." *Id.* at 198.

Such is the case here. Requiring registrants to show approved identification does not create a severe burden because Idaho provides no-fee identification. Although a registrant, who does not already possess an Idaho driver's license, a passport, tribal identification, or a concealed weapon permit, must travel to the department of motor vehicles office to obtain no-fee identification, this requirement does not impose a substantial burden on registrants, and Plaintiffs have provided no evidence House Bill 340 imposes excessively burdensome requirements on any class of voters.

The Secretary has shown House Bill 340 promotes the State's important interests of election security and prevention of voter fraud. (Dkt. 54-1 at p. 23). Balancing these interests against House Bill 340's requirement that registrants provide an approved form of identification to register—which may include no-fee identification—the Court concludes House Bill 340 does not pose an unconstitutional burden on registrants and grants the Secretary summary judgment on Claim 3.

Moreover, Plaintiffs' argument that House Bill 340 violates the Equal Protection Clause because it discriminates "against new registrants compared with existing voters" fails otherwise because "new registrants" and "existing voters" are not similarly situated. Rather existing voters have already registered to vote. In other words, Plaintiffs are attempting to improperly compare the proverbial apples to oranges. *See, e.g.*, *Bonin v. Vasquez*, 807 F. Supp. 589, 621 (C.D. Cal.

1992) ("As for petitioner's equal protection argument, petitioner has failed to recognize a fundamental tenet of such analysis, namely, that the comparison must be made between similarly situated entities. Instead, petitioner has mixed apples and oranges . . . . The Fourteenth Amendment does not require disparate groups to be treated the same. Accordingly, petitioner's claim based on equal protection is without merit."). Contrary to Plaintiffs' argument, House Bill does not treat similarly situated individuals—i.e., those seeking to register to vote—differently. *Crawford*, 553 U.S. at 202 (ruling facial challenge must fail where the statute has a plainly legitimate sweep). For this reason and because House Bill 340 advances important interests, its minimal burden is not unconstitutional. Accordingly, this Court grants the Secretary summary judgment on Plaintiffs' equal protection claim.

## ORDER

**IT IS ORDERED that:**

1.  Defendant's Motion for Summary Judgment (Dkt. 54) is GRANTED.

2.  Plaintiffs' Motion for Partial Summary Judgment (Dkt. 55) is DENIED.

DATED: September 17, 2024

Amanda K. Brailsford
Amanda K. Brailsford
U.S. District Court Judge